UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                         :
In Re:                                                   :    Multi-District Litigation
    BIOMET M2A MAGNUM HIP                       :    3:12-md-2391 (RLM) (CAN)
    IMPLANT PRODUCTS LIABILITY                   :
    LITIGATION (MDL 2391),                       :
                                                         :
This document refers to:                                 :
ALL CASES                                                :
                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**BIOMET'S SUBMISSION IN SUPPORT OF ITS DISCOVERY EFFORTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF ISSUES .................................................................................................. 2

STATEMENT OF FACTS ................................................................................................... 2

I.      DISCOVERY BACKGROUND ................................................................................ 2

II.     DOCUMENT COLLECTION .................................................................................. 4

III.    DOCUMENT PROCESSING AND REVIEW ......................................................... 5

        A.      Search Term Selection ................................................................................. 5

        B.      Technology-Assisted Review ....................................................................... 6

        C.      Document Processing and Hosting Costs .................................................... 8

        D.      Document Review Costs ............................................................................... 9

ARGUMENT ................................................................................................................... 10

I.      BIOMET SHOULD NOT BE REQUIRED TO RESTART DISCOVERY. ......................... 10

        A.      Restarting discovery is inconsistent with the purpose of an MDL. ............ 10

        B.      Plaintiffs' inaction should not be rewarded at Biomet's expense. ............. 12

II.     BIOMET'S DISCOVERY EFFORTS COMPLY WITH THE FEDERAL RULES OF
        CIVIL PROCEDURE AND APPLICABLE CASE LAW. ...................................... 13

        A.      No review tool or search methodology guarantees perfection. .................. 14

        B.      Search terms are a reasonable and accepted search methodology. ............. 14

                1.      Search term limitations can be managed with statistical sampling. ............... 16

                2.      Biomet's search terms are effective. .................................................... 17

                3.      Biomet has offered Plaintiffs several opportunities to provide input, which
                        Plaintiffs have declined. ................................................................... 17

                4.      Technology-assisted review should not be used to increase discovery costs. 18

        C.      Joint training of the predictive coding software is not required. .................. 19

                1.      Biomet's discovery obligations are governed by the Federal Rules regardless
                        of search methodology. ..................................................................... 19

i

# TABLE OF CONTENTS
## (CONTINUED)

Page

2.     The Federal Rules provide a mechanism for resolving relevance disputes, which applies equally to predictive coding. ........................................................ 20

3.     Biomet should not be required to produce non-relevant documents or waive work product protections. ................................................................................... 21

4.     Joint training of the predictive coding software is not required by case law .. 23

III.    BIOMET IS NOT REQUIRED TO CONDUCT DISCOVERY BY PLAINTIFFS' PREFERRED METHOD. ............................................................................................. 24

IV.    THE BURDEN OF STARTING OVER IS NOT PROPORTIONAL TO THE BENEFIT. ................................................................................................................. 26

CONCLUSION ........................................................................................................................ 30

## TABLE OF AUTHORITIES

Page(s)

CASES

*Adair v. EQT Prod. Co.,*
  No. 1:10-cv-00037, 2012 U.S. Dist. LEXIS 75132 (W.D. Va. May 31, 2012) ...............................28

*Boeynaems v. La Fitness Int'l,*
  285 F.R.D. 331 (E.D. Pa. 2012) ........................................................................................................29

*Conn. General Life Ins. Co. v. Earl Scheib, Inc.,*
  No. 11-cv-00788, 2013 U.S. Dist. LEXIS 16234 (S.D. Cal. Feb. 6, 2013) ....................................28

*Countryman v. Cmty. Link Fed. Credit Union,*
  No. 1:11-cv-00136, 2012 U.S. Dist. LEXIS 47681 (N.D. Ind. Apr. 3, 2012) ................................28

*Custom Hardware Eng'g & Consulting, Inc. v. Dowell,*
  No. 4:10-cv-00653, 2012 U.S. Dist. LEXIS 146 (E.D. Mo. Jan. 3, 2012) ......................................14

*Da Silva Moore v. Publicis Groupe,*
  287 F.R.D. 182 (S.D.N.Y. 2012), *adopted by* 2012 U.S. Dist. LEXIS 58742 (S.D.N.Y. Apr.
  25, 2012) ................................................................................................................................... passim

*EEOC v. McCormick & Schmick's Seafood Rests., Inc.,*
  No. 08-cv-00984, 2012 U.S. Dist. LEXIS 13134 (D. Md. Feb. 3, 2012) ........................................16

*FDIC v. Johnson,*
  No. 2:12-cv-00209, 2013 U.S. Dist. LEXIS 40092 (D. Nev. Mar. 21, 2013) .................................22

*Fisher v. Ciba Specialty Chems. Corp.,*
  No. 03-cv-00566, (WS), 2007 U.S. Dist. LEXIS 24173 (S.D. Ala. Mar. 30, 2007).........................14

*Gabriel Technologies Corp. v. Qualcomm Inc.,*
  No. 08-cv-01992, 2013 U.S. Dist. LEXIS 14105 (S.D. Cal. Feb. 1, 2013) ...............................23, 24

*Gen. Steel Domestic Sales, LLC v. Chumley,*
  No. 10-cv-01398, 2011 U.S. Dist. LEXIS 63803 (D. Colo. June 15, 2011) ...................................29

*Global Aerospace, Inc. v. Landow Aviation, L.P., et al.,*
  No. CL 61040, 2012 Va. Cir. LEXIS 50 (Va. Cir Ct. April 23, 2012) ...............................................23

*Grant v. Homier,*
  No. 3:07-cv-00116, 2007 U.S. Dist. LEXIS 63083 (N.D. Ind. Aug. 24, 2007).......................26, 29

*Hickman v. Taylor,*
  329 U.S. 495 (U.S. 1947) ...............................................................................................................22

*In re Actos (Pioglitazone) Prods. Liab. Litig.,*
  MDL No. 6:11-md-2299 (W.D. La.) ...................................................................................................23

iii

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*In re FedEx Ground Package Sys. Emp't Practices Litig.*,
   No. 3:05-md-00527, 2007 U.S. Dist. LEXIS 16205 (N.D. Ind. Mar. 5, 2007) ...............................28

*In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*,
   MDL No. 2121, 2011 U.S. Dist. LEXIS 145804 (S.D. Cal. Dec. 19, 2011)....................................17

*In re Seroquel Prods. Liab. Litig.*,
   244 F.R.D. 650 (M.D. Fla. 2007) ................................................................................................ 16, 17

*Kleen Prods., LLC, et al. v. Packaging Corp. of Amer.*,
   No. 1:10-cv-05711, 2012 U.S. Dist. LEXIS 139632 (N.D. Ill. Sept. 28, 2012)........................ 24, 25

*Larsen v. Coldwell Banker Real Estate Corp.*,
   No. 10-cv-00401 (AG), 2012 U.S. Dist. LEXIS 12901 (C.D. Cal. Feb. 2, 2012) .............. 15, 21, 29

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
   No. 03-cv-07037, 2005 U.S. Dist. LEXIS 2866 (S.D.N.Y. Feb. 24, 2005)......................................14

*Mancia v. Mayflower Textile Servs. Co.*,
   253 F.R.D. 354 (D. Md. 2008) .......................................................................................................19

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   685 F. Supp. 2d 456 (S.D.N.Y. 2010)............................................................................................14

*Rodriguez-Torres v. Gov't Dev. Bank of P.R.*,
   265 F.R.D. 40 (D.P.R. 2010) .........................................................................................................28

*Romero v. Allstate Ins. Co.*,
   271 F.R.D. 96 (E.D. Pa. 2010) ......................................................................................................17

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
   205 F.R.D. 421 (S.D.N.Y. 2002) ...................................................................................................29

*Takacs v. Union County*,
   No. 08-cv-00711, 2009 U.S. Dist. LEXIS 87632 (D.N.J. Sept. 14, 2009) ................................ 27, 29

*Tamburo v. Dworkin*,
   No. 04-cv-03317, 2010 U.S. Dist. LEXIS 121510 (N.D. Ill. Nov. 17, 2010)..................................27

*Thermal Design, Inc. v. Guardian Bldg. Prods.*,
   No. 08-cv-00828, 2011 U.S. Dist. LEXIS 50108 (E.D. Wis. Apr. 20, 2011) ..................................29

*Treppel v. Biovail Corp.*,
   233 F.R.D. 363 (S.D.N.Y. 2006) ............................................................................................... 13, 14

*Trusz v. UBS Realty Investors LLC*,
   No. 3:09-cv-00268, 2010 U.S. Dist. LEXIS 92603 (D. Conn. Sept. 7, 2010) .......................... 14, 16

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Velocity Press, Inc. v. KeyBank, N.A.,*
No. 2:09-cv-00520, 2011 U.S. Dist. LEXIS 45249 (D. Utah Apr. 26, 2011) ................................... 14

*Victor Stanley, Inc. v. Creative Pipe, Inc.,*
250 F.R.D 251 (D. Md. 2008), *aff'd in part,* 2010 U.S. Dist. LEXIS 144044 (D. Md. Nov.
1, 2010) ......................................................................................................................................... 18

**STATUTES**

Fed. R. Civ. P. 1 ...................................................................................................................................... 26

Fed. R. Civ. P. 26 ........................................................................................................................... passim

Fed. R. Civ. P. 34 ...................................................................................................................................... 19

Fed. R. Civ. P. 37 ...................................................................................................................................... 20

**OTHER AUTHORITIES**

David Blair & M.E. Maron, *An Evaluation of Retrieval Effectiveness for a Full-Text Document
Retrieval System* J. 28 J. A.C.M. 289 (Mar. 1985).................................................................... 16

David J. Lender & Hon. Andrew J. Peck, *10 Key E-Discovery Issues In 2011: Expert Insight to
Manage Successfully,* 19 Metro. Corp. Counsel 1, 6 (Apr. 2011) ............................................ 15

Manual for Complex Litigation § 11.446 (4th ed. 2004) ............................................................. 4

Maura R. Grossman and Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-
Assisted Review,* 2013 Fed. Cts. L. Rev. 7 (January 2013) ........................................................ 6

Sedona Conference, *The Sedona Conference Best Practices Commentary on the Use of Search and
Information Retrieval Methods in E-Discovery,* 8 Sedona Conf. J. 189 (2007) .......................... 15

Sedona Conference*, The Sedona Principles: Best Practices Recommendations & Principles for
Addressing Electronic Document Production* (2d ed. 2007) .................................................. 21, 24

Sedona Conference, *The Sedona Conference Commentary on Proportionality in Electronic Discovery*
(Jan. 2013) ............................................................................................................................... 13, 27

Sedona Conference, *Conducting E-discovery After the Amendments: The Second Wave,* 10
Sedona Conf. J. 215 (2009) ...................................................................................................... 16

## PRELIMINARY STATEMENT

The parties agree that technology-assisted document review is a good idea. This technology has recently emerged in electronic discovery as a tool to reduce the high costs of manual document review. The issue here is not whether Biomet should use technology-assisted review, but whether Biomet should be required to use it in the manner prescribed by Plaintiffs, which will not only increase Biomet's discovery costs by at least $3 million and prolong discovery by over a year, but also will waste the time, effort, and expense already expended on discovery during the past year.

Specifically, the parties disagree on the following issues related to technology-assisted review (also called "predictive coding"). First, Plaintiffs believe that technology-assisted review should be applied to Biomet's entire initial document collection because search terms are inadequate. This approach is cost-prohibitive. Search terms are a reasonable and cost-effective way to cull data to a more manageable amount before review, regardless of whether the review will be manual or technology-assisted. In addition, statistical analysis demonstrated that Biomet's search terms are effective: the documents pulled in by the search terms are about 16% responsive, whereas the documents left behind are less than 1.5% responsive. Biomet has offered to meet and confer on additional reasonably-targeted search terms and to produce the non-privileged documents included in the statistical sample to allay Plaintiffs' concerns that many relevant documents were left behind. Plaintiffs have declined these offers.

Second, Plaintiffs insist that the parties should train the predictive coding algorithm jointly. Joint training is not required by the Federal Rules, case law, or Orders of this Court. It is also not feasible because Biomet has already expended substantial time, effort, and expense in training the predictive coding software to identify relevant documents. Although not obligated to do so, Biomet has nevertheless offered to include Plaintiffs' input in the training by adding relevant documents of their choice to the data set and using them to train the predictive coding software going forward.

<u>Third</u>, Plaintiffs demand that Biomet produce all non-privileged documents already identified by keyword searches regardless of relevance. Biomet believes that this request is beyond the scope of permissible discovery, which is limited to "any nonprivileged matter that is ***relevant*** to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

Biomet is open to working cooperatively with Plaintiffs to address their concerns in a cost-effective and proportional manner that is consistent with the Federal Rules of Civil Procedure, the Seventh Circuit Electronic Discovery Pilot Program, and the Sedona Conference principles and guidance. But Plaintiffs' requests are prohibitively expensive and unnecessary for a reasonable and transparent technology-assisted review process.

## STATEMENT OF ISSUES

1. Should the Court require Biomet to restart discovery, which would cost $3 to $8 million and prolong discovery by more than a year?

2. Should the Court require Biomet to use technology-assisted review on the entire 19.5 million initial document collection rather than to first cull out relevant documents using search terms?

3. Should the Court require Biomet to retrain the technology-assisted review software, which has already "learned" to recognize relevant documents, so that the training could be performed jointly by the parties?

## STATEMENT OF FACTS

## I.     DISCOVERY BACKGROUND

Plaintiffs began filing the actions in this MDL in January 2012. Before the October 2012 consolidation, the parties engaged in discovery, including initial disclosures and document requests, in several cases. The first document requests were served in the *Faber* case in April 2012. *Faber v. Biomet, Inc. et al.*, E.D.N.Y., 1:12-cv-00783. In May and June 2012, plaintiffs in the *St. Cyr, Ching,* and *Winningham* cases each served over 170 discovery requests. *St. Cyr v. Biomet Orthopedics, LLC et al.*,

N.D. Tex., 4:12-cv-00032; *Ching v. Biomet Orthopedics, LLC et al.*, N.D. Cal., 5:12-cv-00502, *Winningham v. Biomet Orthopedics, LLC et al.*, N.D. Co., 1:12-cv-02376. Biomet began producing documents in June 2012 in response to these requests and in Biomet's initial disclosures. In total, Biomet has produced almost two million pages spanning seven document productions to the following attorneys in nine individual cases:

- Ellen Relkin of Weitz & Luxenberg PC in *Benson v. Biomet, Inc. et al.*, E.D. Wash., 2:12-cv-05131

- Brian J. Devine and Kenneth M. Seeger of Seeger Salvas LLP in *Ching v. Biomet Orthopedics, LLC et al.*, N.D. Cal., 5:12-cv-00502 and *Winningham v. Biomet Orthopedics, LLC et al.*, N.D. Co., 1:12-cv-02376

- Lawrence Jones II and Jasper Ward of Jones Ward PLC in *Edelen et al. v. Biomet, Inc. et al.*, W.D. Ky., 3:12-cv-00438 and *Wurzel et al v. Biomet, Inc. et al.*, W.D. Ky., 3:12-cv-00491

- Robert E. Godosky of Godosky & Gentile, P.C. in *Faber v. Biomet, Inc. et al.*, E.D.N.Y., 1:12-cv-00783

- Joseph Shea, Shirly A. Coffey , Greg Hartmann, and Michelle A. Cheek of Shea, Coffey & Hartmann in *Graham v. Biomet, Inc. et al.*, S.D. Ohio, 1:12-cv-00451

- John David Hart of the Law Offices of John David Hart in *St. Cyr v. Biomet Orthopedics, LLC et al.*, N.D. Tex., 4:12-cv-00032

- John R. Climaco, Dawn M. Chmielewski, and Patrick G. Warner of Climaco, Wilcox, Peca, Tarantino & Garofoli, LPA, Jerrold S. Parker and Daniel C. Burke of Parker Waichman LLP, and Richard J. Arsenault and C. Michael Bollinger of Neblett, Beard & Arsenault in *Ward-Davis v. Biomet Orthopedics, LLC et al.*, S.D. Ohio, 2:12-cv-00396

Biomet provided the attorneys in each of these cases detailed information regarding custodians and data sources, keywords used, and Biomet's predictive coding workflow months ago. (*See* Exh. A, Aug. 21, 2012 Letter from Jenya Moshkovich to Robert Godosky and accompanying exhibits A, B, & C ("Letter Exh.")).

On February 7, 2013, MDL Plaintiffs served 184 discovery requests that are virtually identical to those in *St. Cyr, Ching,* and *Winningham.* The additional MDL requests sought documents

identified by Biomet's keyword searches before applying predictive coding, as well as all documents

produced in the individual cases. Biomet responded to these requests on March 19, 2013.

## II.      DOCUMENT COLLECTION

Biomet began collecting documents relating to Biomet's metal-on-metal hip replacement

implants in April 2012 from twenty-eight individual custodians and centralized data sources. (*See*

Exh. A, Letter Exhs. A & B). These individual custodians are the primary individuals with

responsibility for the metal-on-metal devices across relevant departments including design,

development, regulatory, clinical affairs, marketing and commercialization, and public relations.

Biomet collected these custodians' e-mails, hard drives, dedicated network storage, and hard copy

files. (*See* Exh. A, Letter Exh. A). Because Biomet's shared documents are not maintained in one

centralized electronic location (such as one shared metal-on-metal implants folder), ensuring a

reasonably complete collection required collecting broadly. For example, Biomet collected the full

regulatory, clinical affairs, and creative services shared network drives which, in addition to metal-

on-metal, also contain many documents unrelated to this litigation like non-metal-on-metal hip,

knee, and shoulder implants, as well as Biomet's sports medicine, trauma, and spine products. (*See*

Exh. A, Letter Exh. B).

In total, Biomet collected over 19.5 million documents, comprising 6.3 terabytes. ( Exh. B,

March 31, 2013 Declaration of Eric Seggebruch ("Seggebruch Decl." ) ¶ 12). As estimated by the

Manual for Complex Litigation, one terabyte equals about **500 *billion*** typewritten pages of plain

text. MCL § 11.446 (4th ed. 2004). "The sheer volume of such data, when compared with

conventional paper documentation can be staggering." *Id*. Not reducing the volume to a more

manageable amount before beginning review is simply not feasible, regardless of whether the review

is manual or technology-assisted.

## III.     DOCUMENT PROCESSING AND REVIEW

### A.      Search Term Selection

To cull data before applying technology-assisted review, Biomet selected search terms to help narrow the documents to those that are related to metal-on-metal hip implants[1] and Plaintiffs' allegations about them. [2] (*See* Exh. A, Letter Exh. C). Biomet's search terms also included all manufacturing part numbers, Design History File project numbers (assigned to devices while in development), and 510(k) numbers (assigned by the FDA when evaluating a device for marketing clearance) of Biomet's metal-on-metal hip implants. (*See* Exh. A, Letter Exh. C). Biomet was only able to select broad keywords like "metal," "cancer," and "revision" because it intended to use technology-assisted review to help sort through many non-relevant documents these keywords would return.

The total number of documents and corresponding attachments retrieved by keyword culling was 3,931,687, comprising 1.5 terabytes (1,536 GB) of data. (Seggebruch Decl. ¶ 13). After deduplication, 2,540,915 documents and attachments remained, comprising 1.06 terabytes (1,085 GB). (*Id.* ¶ 14). The remaining 15,576,529 documents not selected by keywords (referred to as the "null set") totaled 4.89 terabytes (5,007 GB). (*Id.* ¶ 15).

Biomet's search terms were tested using statistical sampling. (Exh. C, March 30, 2013 Declaration of Alexis Clark ("Clark Decl.") ) ¶ 13). To obtain the relevance rate of the null set, Biomet reviewed a random sample of 4,146 documents (using a confidence level of 99% and

---

[1] Biomet's search terms referring to metal-on-metal implants included:
"Metal" M2a* "M-M" "MoM" "Metal on Metal" "Metal-on-Metal" "Co-Cr-Mo" "CoCrMo" Cobalt and Chromium "All Metal Hip" Magnum* M2a* pre/1 Magnum* M2a* pre/1 acetabular pre/1 system* M2a* pre/1 Taper* M2a* pre/1 Ringloc* M2a* pre/1 38* M2a* pre/1 28* "Metal on Metal articulation" "Metal-on-metal articulation"

[2] Biomet's search terms referring to Plaintiffs' allegations included:
Pseudotumor* Pseudo pre/1 tumor* Tumor* "Metallosis" "Cancer" "Cobaltism" Metal /2 ion* "Debris" Tissue /2 damage* Tissue /2 necrosis Bone /2 loss Hypersensitiv* Metal /2 reaction Metal /2 poison* Metal /2 toxic* Revision* Joint pre/1 Registr* "NJR"

estimation interval of 2%). (*Id.*). Thirty-nine documents were responsive. Projecting these results over the data indicates, with 99% confidence, that there are only between 86,299 and 206,541 responsive documents within the 15.5+ million not selected for review—between .55% and 1.33%. (*Id.*).

To obtain a baseline responsiveness rate of the documents 2.5+ million documents selected for review, Biomet reviewed a random "control set" sample of 1,689 documents (95% confidence level +/- 2%), (which indicated that there are between 184,268 and 229,162 relevant documents in the review set (between 14.41% and 17.91%, with a mean of 16.16%). (*Id.* ¶ 11, 16).In addition, Biomet obtained the relevance rate of the entire 19.5+ million document collection using statistical sampling. (Clark Decl. ¶ 12). A 4,146 document sample (using a confidence level of 99% and estimation interval of 2%) contained eighty responsive documents, indicating with 99% confidence that the responsiveness rate of the full collection is between 1.37 and 2.47 percent. (*Id.*)

The results of the sampling validate Biomet's discovery efforts. Biomet collected broadly to ensure a reasonably comprehensive collection, which contained less than 2.5% relevant documents. Biomet then successfully used search terms to retrieve documents likely to be responsive, as demonstrated by the 16% responsiveness rate of the documents selected for review and by the less than 1.5% responsiveness rate of the documents left behind.

## B.    Technology-Assisted Review

Technology-assisted review is machine-learning technology that enables a computer to distinguish between relevant and non-relevant documents based on limited human input. *See, e.g.,* Maura R. Grossman and Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-Assisted Review*, 2013 Fed. Cts. L. Rev. 7 (Jan. 2013). Use of technology-assisted review in legal document discovery is relatively recent, but the technology is well established and used by many well-known companies including Google, Facebook, Amazon, Netflix, and Pandora, which all make suggestions

on what we may like, purchase, or find interesting based on our past selections. Spam filters are also based on related technology, which classifies email into legitimate "ham" and unsolicited "spam."

Biomet's e-discovery vendor is Recommind, a leader in technology-assisted document review technology. Recommind's predictive coding functionality, provided in its Axcelerate document review platform, combines a proprietary, advanced text categorization algorithm with an iterative document review workflow. (Clark Decl. ¶ 6). Predictive coding is a powerful technology that enables finding documents relating to a particular person, timeframe, topic, communication, issue, or concept more quickly and at a cost of 50 to 90% less than linear review. (*Id.*).

After the documents selected by search terms were promoted to the Axcelerate review site, Biomet utilized Recommind's predictive coding functionality. To begin, an attorney with knowledge of the case identified and reviewed a "seed set"—an initial group of relevant documents. (*Id.* ¶ 7). Using the attorney's coding decisions, Axcelerate analyzed the remaining documents in the review site to "find more like this" and suggested the next potentially-relevant set for review. (*Id.*). Contract attorneys then reviewed these documents (the full set in earlier iterations and statistically-significant samples in later iterations) for responsiveness, confidentiality, and privilege. The software then analyzed the attorneys' coding decisions and provided the next set of documents for review. (*Id.*). The process was repeated for seven iterations. (*Id.* ¶ 9). In addition to predictive coding, Biomet utilized other technology-assisted review tools provided by Recommind to find relevant documents faster and reduce manual review, which included identifying responsive phrase patterns as well as duplicates, near-duplicates, and e-mail threads of responsive documents.

To date, the responsiveness rate of the documents suggested in these iterations indicates that Axcelerate has learned to distinguish relevant documents, and that the review should proceed through additional iterations until the relevance of documents returned by Axcelerate is sufficiently low. (*Id.*). At that point, a random sample will be drawn from the documents that were not reviewed

for relevance. (*Id.* ¶ 8). The results of this review will then be compared against the control set to determine the recall (the proportion of relevant documents identified during a review) and precision (the proportion of identified documents that are relevant) of the search and review process. (*Id.*).

## C.   Document Processing and Hosting Costs

The electronic discovery services performed by Recommind include various steps of data processing, keyword culling, predictive coding, document productions, and data hosting, among others, totaling $1,069,358 to date. (Seggebruch Decl. ¶ 16). To begin, in order to apply keywords, Recommind preliminarily processed the full 6.3 TB collection at a rate of $30/GB, totaling $196,290. (*Id.* ¶ 6, 19). The resulting 1.06 TBs (1,085 GB) of documents and attachments were then fully processed and "ingested" into the Axcelerate document review platform. (*Id.* ¶ 7). This process included deduplication and extraction of metadata, full text, and native files. (*Id.*). The data was then "enriched" with technological tools that identify phrase patterns and concepts in the data, as well as near-duplicates and e-mail threads. (*Id.* ¶ 8). At that point, the predictive coding workflow described above began. (*Id.* ¶ 9). Processing, ingesting, enriching and running predictive coding on the 1.06 TBs retrieved by keywords cost $705,250, which included data processing and ingestion costs of $325,500 ($300/GB), data enrichment at a cost of $162,750 ($150/GB), and predictive coding costs of $217,000 ($200/GB). (*Id.* ¶ 18).

The cost of processing, ingesting, enriching and running predictive coding on Biomet's full 6.39 terabyte collection, as Plaintiffs suggest, could be as much as $3.25 million. (*Id.* ¶ 16). This amount includes $1,502,100 for data processing and ingestion costs of the 4.89 TBs (5,007 GBs) not yet published to Axcelerate, $751,050 for data enrichment, and $1,001,400 for predictive coding. (*Id.*). These costs may be somewhat less with de-duplication, but they are not likely to be below $2 million. (*Id.* ¶ 17).

In addition, Recommind charges a monthly hosting fee to keep the data accessible. Maintaining 1.06 TBs of documents in Axcelerate for review costs $18/GB per month—approximately $20,000. (*See id.* ¶ 10). In addition, hosting the remaining 4.89 TBs online to enable applying additional search terms (if needed) costs $5/GB per month, or approximately another $25,000. (*See id.*). Once the review population is finalized, this monthly cost can be eliminated by moving this data to a hard drive. If, as Plaintiffs request, the 4.89 TBs were moved into Axcelerate, the hosting costs would increase from $5/GB to $18/GB per month, or by approximately $65,000 per month. (*See Id.* ¶ 19). Again, these costs may be somewhat less with de-duplication, but the total cost of continuing to host this data online is unlikely to fall below $60,000 per month.

### D.    Document Review Costs

Predictive coding reduces, but does not eliminate, the need for manual review. (*Id.* ¶ 20). Instead, it creates a quicker and more cost-effective review process, which is expected to cost 50 to 90% less than manual review of every document. (*Id.* ¶ 20; Clark Decl. ¶ 6).

If the parties run predictive coding on Biomet's full initial collection of 19.5+ million documents as Plaintiffs suggest, and assuming a third are duplicates not needing review, 12.8+ million documents will be published to Axcelerate. Biomet can expect to review 10 to 50% (50-90% less than linear review), or between 1.28 (10%) and 6.4 million (50%) documents.

Biomet utilizes eight contract attorneys costing $48/hour to review documents, as well as $100/hour for one project manager. At a rate of sixty documents per hour (the industry average for manual document review is fifty to sixty), this review would take between 21,333 and 106,666 hours. Eight contract attorneys reviewing documents for forty hours per week would require between fifteen months and six years (66 to 333 weeks) to complete the review. At a rate of $48/hour, the cost of this review would be between $1 and $5 million. This estimate does not include project

management or quality control of the reviewers, redaction of HIPAA-protected health information by paralegals, second level privilege review, or the creation of privilege logs.

Using the same calculations, reviewing 10 to 50% of the 2.5+ million documents published to Axcelerate after applying keywords costs between $200 thousand and $1 million and takes between three and fifteen months (13 to 66 weeks).

In total, from processing to review, Plaintiffs' proposal would cost an additional $3 to $8 million, not including monthly hosting costs, whereas the process carefully developed and implemented by Biomet, much of which has already been completed, costs $1 to $1.7 million.

## ARGUMENT

## I.   BIOMET SHOULD NOT BE REQUIRED TO RESTART DISCOVERY.

Before this MDL was created, Biomet expended substantial time, effort, and expense in collecting, reviewing, and producing documents in a number of individual cases that have now been consolidated with others for pretrial discovery. In doing so, Biomet successfully trained predictive coding software to identify relevant documents over the course of seven iterations and produced almost two million pages spanning seven document productions. These documents are equally applicable to all of the cases in this MDL.

### A.   Restarting discovery is inconsistent with the purpose of an MDL.

Plaintiffs believe that because the Judicial Panel on Multidistrict Litigation ("JPML") consolidated their individual cases into an MDL proceeding, discovery that began a year ago should start anew. (*See* Exh. D, Feb. 7, 2013 Letter from Mark Lanier to John Winter). To the contrary, the JPML created this MDL with the specific purpose of "avoid[ing] duplicative discovery" and "conserv[ing] the resources of the parties, their counsel and the judiciary," as well to "promote the just and efficient conduct of [these actions]." *In re Biomet M2a Magnum Hip Implant Prods. Liab. Litig.*, Transfer Order MDL No. 2391, 2012 U.S. Dist. LEXIS 144172 (J.P.M.L. Oct. 2, 2012). Biomet

10

began discovery in the individual cases in a reasonable and transparent manner and should not be required to start over in the MDL.

Plaintiffs' position that discovery should restart is inconsistent not only with the purpose of a multidistrict litigation, the JMPL's instructions, and the discussions the parties have had since the Biomet cases have been assigned to this Court, but also with Plaintiffs' representations when seeking an MDL. When requesting consolidation, Plaintiffs' co-lead counsel Thomas Anapol argued that "[i]n addition to *significant financial savings*, transfer and consolidation will promote the *convenience of the parties and efficiency* during pre-trial proceedings. *Duplicative discovery will be eliminated*… ." Interested Party Response in Support of Transfer, MDL No. 2391, JPML Dkt. No. 39 at 5 (July 19, 2012). Plaintiffs' co-lead counsel Mark Lanier similarly argued that "[s]*eparate, unconsolidated pretrial proceedings* in the cases that have been and will be filed *would greatly increase the costs of this litigation for all parties*… ." Interested Party Response in Support of Transfer, MDL No. 2391, JPML Dkt. No. 105 at 4 (Sept. 19, 2012); *see also* Plaintiffs' Steering Committee Member Ellen Relkin, Interested Party Response in Support of Transfer, MDL No. 2391, JPML Dkt. No. 57 at 7 (July 20, 2012) ("*[t]o have parallel and overlapping generic discovery taking place is … impractical and inefficient*."); Plaintiffs' Steering Committee Member Lawrence L. Jones II, Interested Party Response in Support of Transfer, MDL No. 2391, JPML Dkt. No. 72 at 1 (Aug. 22, 2012) ("consolidated pretrial proceedings of the M2a cases would *limit duplicative discovery*…and *conserve the resources of the parties*…").

Having successfully persuaded the JPML that consolidation would limit duplicative discovery and result in efficiency and cost savings for both parties, Plaintiffs should not be permitted to increase Biomet's discovery costs by up to $8 million and prolong document discovery by at least a year.

**B.      Plaintiffs' inaction should not be rewarded at Biomet's expense.**

Beginning in August 2012, Biomet informed attorneys in each of the cases receiving document productions regarding: (1) the custodians and data sources collected from, (2) the keywords used, and (3) Biomet's predictive coding workflow. (*See* Exh. A and Letter Exh. A-C). Of the individuals receiving Biomet's document production, five are on the Plaintiffs' Steering Committee, including Ellen Relkin, Lawrence Jones II, John R. Climaco, Daniel C. Burke, and Richard J. Arsenault.

Plaintiffs recently suggested that these attorneys did not object to Biomet's approach because they believed that the cases would be consolidated and discovery handled by the MDL leadership. (*See* Exh. E, Feb. 14, 2013 Email from Mark Lanier to John Winter). Despite the purported certainty of an MDL, these attorneys filed individual cases against Biomet in courts across the county. Doing so, rather than waiting for the creation of an MDL, required Biomet to defend these individual cases and engage in discovery including initial disclosures and discovery responses as required by the Federal Rules of Civil Procedure and by Judges then presiding over these cases. *See, e.g., Benson v. Biomet, Inc. et al.*, 3:12-cv-00624-RLM-CAN, Dkt. No. 6 (June 21, 2012); *Ward-Davis v. Biomet Orthopedics, LLC et al.*, 3:12-cv-00625-RLM-CAN, Dkt. No. 13; *Faber v. Biomet, Inc. et al.*, 3:12-cv-00571-RLM-CAN, Apr. 6, 2012 Dkt. Entry.

Plaintiffs have suggested that they offered to delay individual discovery because they knew an MDL was coming, but Biomet disagreed. Courts in these individual cases ordered discovery to move forward. *See, e.g., Benson v. Biomet, Inc. et al.*, 3:12-cv-00624-RLM-CAN, Dkt. No. 6 (June 21, 2012) ("Counsel are advised that the early disclosure requirements of Fed. R. Civ. P. 26 will be enforced. Therefore, counsel shall immediately exchange the following information without a formal discovery request…"); *Winningham v. Biomet Orthopedics, LLC et al.*, 3:12-cv-00572-RLM-CAN Dkt. No. 2-27 (June 12, 2012) ("The parties are reminded that a failure voluntarily to disclose information

pursuant to Federal Rule of Civil Procedure 26(a) or to supplement disclosures or discovery responses pursuant to Rule 26(e) may result in exclusionary sanctions.") Contrary to Plaintiffs' assertions, Biomet acted properly in complying with its discovery obligations in these individual cases. *See. e.g.. Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006) (when plaintiff refused to agree to search terms, defendant should have proceeded with the search terms unilaterally and that plaintiff's "recalcitrance" did not excuse defendant's failure to produce documents).

Although undoubtedly aware of the high cost of document review and production, Plaintiffs' attorneys continued to accept volume after volume of Biomet's document production—despite knowing that the MDL leadership would demand a "do-over." Under the circumstances, the Court should not require Biomet to restart discovery, which has been conducted in good faith and in full compliance with existing discovery standards and other Court's Orders. The Sedona Conference, *The Sedona Conference Commentary on Proportionality in Electronic Discovery* 2, Principle 3 (Jan. 2013) ("Sedona Proportionality Principles") ("Undue burden, expense, or delay resulting from a party's action or inaction should be weighed against that party.").

## II.   BIOMET'S DISCOVERY EFFORTS COMPLY WITH THE FEDERAL RULES OF CIVIL PROCEDURE AND APPLICABLE CASE LAW.

In demanding a "do-over," Plaintiffs raise two objections to Biomet's discovery efforts to date. One, Plaintiffs object to Biomet's use of search terms to cull data before employing predictive coding. Two, Plaintiffs believe that the predictive coding software, which has already been trained by Biomet to recognize relevant documents, should be retrained jointly by the parties. Neither objection warrants restarting discovery:   search terms are a reasonable, commonly-used, and judicially-accepted methodology for identifying responsive documents, and joint relevance training is not required by the Federal Rules or by case law, and is not necessary here.

13

### A.    No review tool or search methodology guarantees perfection.

Biomet does not contend that search terms will uncover every relevant document in Biomet's possession; nor is it required to. No review process or tool can guarantee perfection. *See Da Silva Moore v. Publicis Groupe*, 287 F.R.D. 182, 191 (S.D.N.Y. 2012) ("While this Court recognizes that computer-assisted review is not perfect, the Federal Rules of Civil Procedure do not require perfection."), *adopted by* 2012 U.S. Dist. LEXIS 58742, at *3 (S.D.N.Y. Apr. 25, 2012); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 461, (S.D.N.Y. 2010).

Rather, a party is obligated to "conduct a diligent search," which involves using "a reasonably comprehensive search strategy." *Treppel*, 233 F.R.D. at 374; *see also Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03-cv-07037 (PKC)(MHD), 2005 U.S. Dist. LEXIS 2866, at *28 (S.D.N.Y. Feb. 24, 2005) (litigants should "ensure[s] that document searches, when initially made, were careful and thorough"). The Federal Rules do not require litigants "to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations." *Velocity Press, Inc. v. KeyBank, N.A.*, No. 2:09-cv-00520 (TS), 2011 U.S. Dist. LEXIS 45249, at *8 (D. Utah Apr. 26, 2011) (citing *Treppel*, 233 F.R.D. at 374 (S.D.N.Y. 2006)); *see also Fisher v. Ciba Specialty Chems. Corp.*, No. 03-cv-00566 (WS), 2007 U.S. Dist. LEXIS 24173, at *10 (S.D. Ala. Mar. 30, 2007) ("The rules of discovery do not demand perfection, clairvoyance, or miracle workings in the production of documents."). Biomet has met these standards. Using search terms to cull and then apply predictive coding to assist in reviewing these documents, Biomet conducted a diligent, careful, and thorough search.

### B.    Search terms are a reasonable and accepted search methodology.

Search terms are a reasonable, commonly-used, and judicially-accepted approach to culling large volumes of data. *See, e.g., Custom Hardware Eng'g & Consulting, Inc. v. Dowell*, No. 4:10-cv-00653

14

(ERW), 2012 U.S. Dist. LEXIS 146, at *7 (E.D. Mo. Jan. 3, 2012); *Trusz v. UBS Realty Investors LLC,* No. 3:09-cv-00268 (JBA), 2010 U.S. Dist. LEXIS 92603, at *17 (D. Conn. Sept. 7, 2010). Even the first decision approving technology-assisted review emphasized that, although not without limitations, "[k]eywords have a place in production of [electronically stored information]." *Da Silva Moore,* 287 F.R.D. at 190.

Use of search terms is also contemplated by the Seventh Circuit Discovery Principles, as well as by other e-discovery pilot projects.[3] *See* Case Management Order, Exh. A, Principles Relating to the Discovery of Electronically Stored Information, Principle 2.05, No. 3:12-md-02391-RLM-CAN, Dkt. No. 242 (ND. Ind. Feb. 25, 2013). The Sedona Conference has also recognized search terms as "the most commonly used search methodology today." The Sedona Conference, *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189, 200 (2007) ("*Sedona Best Practices Commentary*").[4]

Despite their position that search terms are inadequate, Plaintiffs' e-discovery vendor Douglas Forrest recently chided the defendants in the *Da Silva Moore* case for rejecting an automated privilege review using keywords. *See* Nov. 16, 2012 Declaration of Douglas E. Forrest ¶¶ 38–39, 1:11-cv-01279 (ALC) (AJP), Dkt. No. 369-7 (quoting David J. Lender & Hon. Andrew J. Peck, *10 Key E-Discovery Issues In 2011: Expert Insight to Manage Successfully*, 19 Metro. Corp. Counsel 1, 6 (Apr. 2011)) ("Appropriate use of keywords and/or other automated search techniques can identify most

---

[3]   *See* In re: Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York, Standing Order, No. 1:11-misc-00388, at 21 (S.D.N.Y. Nov. 1, 2011), *available at* http://www.nysd.uscourts.gov/rules/Complex_Civil_Rules_Pilot.pdf (last visited April 1, 2013).

Ad Hoc Committee for Electronic Discovery, Default Standard For Discovery, Including Discovery of Electronically Stored Information, ¶ 5(b) at 5 (D. Del. Dec. 8, 2011), *available at* http://www.ded.uscourts.gov/sites/default/files/Chambers/SLR/Misc/EDiscov.pdf (last visited April 1, 2013).

[4]   Judicial opinions are increasingly relying on the Sedona Conference, a prominent not-for-profit and non-partisan research and educational institute, for "guidance in matters regarding electronic discovery." *See Larsen v. Coldwell Banker Real Estate Corp.*, No. 10-cv-00401 (AG), 2012 U.S. Dist. LEXIS 12901, at *20 n.2 (C.D. Cal. Feb. 2, 2012) (citing cases).

potentially privileged documents …"). That this testimony addressed a privilege review is particularly significant: unlike a relevance review, which does not require finding every relevant document, in privilege review that is precisely the goal (irrespective of a Fed. R. Evid. 502(d) order).

### 1. Search term limitations can be managed with statistical sampling.

The limitations of search terms are well known. One of the most commonly-cited studies for Plaintiffs' proposition that search terms may return only 20 to 25% of the relevant documents was conducted in 1985. (*See* Exh. F, Transcript of the March 18, 2013 Status Conference ("March 18, 2013 Tr."), at 7:14–19); David Blair & M.E. Maron, *An Evaluation of Retrieval Effectiveness for a Full-Text Document Retrieval System*, 28 J. A.C.M. 289 (Mar. 1985). Search terms nonetheless became a commonly-used way to focus a large document collection because manually reviewing every document is too costly. *See, e.g., EEOC v. McCormick & Schmick's Seafood Rests., Inc.*, No. 08-cv-00984 (WMN), 2012 U.S. Dist. LEXIS 13134, at *14 (D. Md. Feb. 3, 2012) ("Common practice governing the discovery of electronically stored information requires the use of search terms to make an extraordinarily burdensome search comply with the tenets of Fed.R.Civ.Proc. 26(b)(2)(C)."). This practice has not changed with the introduction of technology-assisted document review. Like manual review, technology-assisted review of every document, which currently is priced on a per gigabyte basis, is quite costly.

Statistical sampling is a best practice for testing search terms effectiveness. *See Trusz*, 2010 U.S. Dist. LEXIS 92603, at *17 (citing The Sedona Conference, *Conducting E-discovery After the Amendments: The Second Wave*, 10 Sedona Conf. J. 215, 223 (2009)); *see also In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 660 n.6, 662 (M.D. Fla. 2007). "As with keywords or any other technological solution to ediscovery, counsel must design an appropriate process, including use of available

technology, with appropriate quality control testing, to review and produce relevant ESI while adhering to Rule 1 and Rule 26(b)(2)(C) proportionality." *Da Silva Moore*, 287 F.R.D. at 193.

### 2.   Biomet's search terms are effective.

Biomet conducted the statistical sampling contemplated by these decisions and by the Sedona Conference and found that the responsiveness rate of the null set (i.e. the documents not pulled in by search terms) is less than 1.5%, as compared to a 16% rate of the keyword-selected documents. (Clark Decl. ¶ 13). These results are not surprising given the expansive nature of the initial collection and the broad search terms used to narrow it to metal-on-metal documents. As recognized by the Plaintiffs' e-discovery vendor, ILS, "[r]esearch casting doubt on keywords in general does little if anything to diminish a party's ability to defend the application of keywords in their specific case." (*See* Exh. G, ILS, *Asymmetrical Plaintiffs Can Hit the eDiscovery Sweet Spot*, dated Apr. 11, 2011, *available at* http://www.ilsteam.com/2011/04/11/asymmetrical-plaintiffs-can-hit-the-ediscovery-sweet-spot/ (last visited Apr. 1, 2013)). Here, Biomet has defended its search terms by demonstrating their effectiveness with empirical evidence.

### 3.   Biomet has offered Plaintiffs several opportunities to provide input, which Plaintiffs have declined.

In deciding which search terms are appropriate, courts emphasize the importance of cooperation between the parties in selecting them. *See In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*, MDL No. 2121, 2011 U.S. Dist. LEXIS 145804, at *21–22 (S.D. Cal. Dec. 19, 2011) ("[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process.") (citing *In re Seroquel*, 244 F.R.D. at 662); *see also Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 109–10 (E.D. Pa. 2010).

Biomet has attempted to cooperate with Plaintiffs by inviting their input into search term selection, which Plaintiffs have declined. (Exh. H, Feb. 13, 2013 Letter from John Winter to Mark Lanier and Exh. I, March 8, 2013 Email from Jenya Moshkovich to Richard Arsenault). At the March 18, 2013 conference, Plaintiffs argued that they are "at quite a disadvantage" in selecting search terms because they are "in the embryonic stages of the case" and "don't understand the language." (*See* March 18, 2013 Tr. at 6:20–22). As the court explained in *Da Silva Moore*, the search term selection process can sometimes be akin to a child's game of 'Go Fish,' when the requesting party guesses what is in the other party's cards. *See Da Silva Moore*, 287 F.R.D. at 190–91 (citing Ralph C. Losey, *Child's Game of 'Go Fish' is a Poor Model for e-Discovery Search*, Adventures in Electronic Discovery 209–10 (2011). Although often a concern in the beginning of discovery, here, Plaintiffs already have almost two million of Biomet's "cards" from which to select search terms.

### 4. Technology-assisted review should not be used to increase discovery costs.

In selecting its search terms, Biomet was mindful of their limitations, including the risk that they may be over-or under-inclusive. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D 251, 257 (D. Md. 2008), *aff'd in part,* 2010 U.S. Dist. LEXIS 144044 (D. Md. Nov. 1, 2010) (citing Sedona Best Practices Commentary at 194–95). In an effort to balance benefit and cost, Biomet opted for over-inclusiveness. This option was available because of the cost savings anticipated by replacing some of the manual document review with technology-assisted review.

The purpose of technology-assisted review, as explained in the article cited by the Plaintiffs at the March 15, 2013 conference, is to "provide a significant shortcut in large document reviews and therefore a substantial cost savings." (*See* Exh. J, New York Law Journal, *Technology-Assisted Review is a Promising Tool for Document Production*, dated March 18, 2013 ("NYLJ Article")).

In this case, Biomet has already spent over $1 million on conducting predictive coding on the 2.5+ million documents selected by search terms. (Seggebruch Decl. ¶ 16). Expanding predictive coding to the remaining 15.5+ million documents would cost between $2 and $3.25 million more in processing costs, (Seggebruch Decl. ¶¶ 16-17), as well as between $1 and $5 more million on review. Requiring Biomet to use technology-assisted review on the entire collection would defeat the purpose of electing to use it at all: a combination of narrowly-tailored search terms and traditional manual review would be far less costly.

### C. Joint training of the predictive coding software is not required.

Jointly training predictive coding software, as Plaintiffs demand, has no basis in the Federal Rules, case law, or Orders of this Court. Biomet already expended substantial time, effort, and expense in training this software to identify relevant documents over the course of seven iterations. The training, used to identify documents responsive to discovery requests served in the *St. Cyr*, *Ching* and *Winningham* cases nine months ago, is equally applicable to all of the cases in the MDL because the discovery requests in these cases and the MDL are virtually identical.

### 1. Biomet's discovery obligations are governed by the Federal Rules regardless of search methodology.

Biomet's discovery obligations are governed by the Federal Rules of Civil Procedure and do not vary depending on the search methodology used. Rule 26(g)(1)(B) requires the producing party to certify that "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," its response to discovery requests is "consistent with these rules and warranted by existing law… ." Fed. R. Civ. P. 26(g)(1)(B)(i); *see also Da Silva Moore*, 287 F.R.D. at 187. The duty to make a "reasonable inquiry" is satisfied if "the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances." *See* Fed. R. Civ. P. 26(g)

Advisory Committee's Notes to 1983 Amendments; *see also Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 357 (D. Md. 2008).

Relatedly, Rule 34(b)(2) requires a response to each discovery request with either the requested discovery or an objection and the reason for it. *See* Fed. R. Civ. P. 34(b)(2)(B)-(C). By demanding joint re-training, Plaintiffs imply that Biomet is less capable of identifying the requested documents with technology-assisted review than with manual document review. There is no basis for this distinction. Both traditional manual review and technology-assisted review require similar document reviewer training. That a portion of the technology-assisted review workflow also involves training software is not a distinction requiring an overhaul of the entire discovery process set forth in the Federal Rules. Biomet should not be required to change its approach unless and until Plaintiffs can show noncompliance with the Federal Rules—which they cannot.

### 2. The Federal Rules provide a mechanism for resolving relevance disputes, which applies equally to predictive coding.

If Plaintiffs believe that Biomet has not met its discovery obligations, they have recourse regardless of the search method applied. The mechanism for resolving discovery disputes is for the parties to confer regarding Fed. R. Civ. P. 34 discovery requests and responsesand to move to compel when necessary. *See* Fed. R. Civ. P. 37. The parties' disagreements regarding relevance are clear from Biomet's discovery responses. For example, Plaintiffs requested documents relating to the Biomet M2a-Magnum, M2a-38, M2a-Taper, M2a-Ringloc, M2a-28mm, Biomet Stanmore, and Biomet Exceed ABT Hip Systems, while Biomet limited its responses only to the Biomet M2a-Magnum and M2a-38, the devices then at issue in this MDL. (*See* Exh. K, Plaintiffs' First Request for the Production of Documents to Defendants, dated Feb. 7, 2013, Definitions ¶ 7 at 4 and Exh. L, Defendants' Responses to Plaintiffs' First Request for the Production of Documents, dated Mar. 19, 2013, General Objections ¶ 2 at 2). Plaintiffs also requested broad discovery regarding Biomet's

interactions with foreign regulatory bodies. (*See, e.g.,* Exh. K, Request No. 33.) Biomet responded that it will produce such documents only to the extent they relate to device safety and investigation. (*See* Exh. L, Response to Request No. 33.) If Plaintiffs believe that they are entitled to this discovery, the mechanism for attempting to obtain it is a meet and confer that, if unsuccessful, is followed by a motion to compel. *See* Fed. R. Civ. P. 37. Handling these disagreements while attempting to train the software and involving a special discovery master to resolve these disputes on a document by document basis, as Plaintiffs suggest, is unnecessary and will not expedite discovery or reduce costs.

### 3.    Biomet should not be required to produce non-relevant documents or waive work product protections.

Rule 26(b)(1) limits the scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense." In light of this fundamental rule, Plaintiffs' demand that Biomet produce all non-privileged documents already identified by keyword searches regardless of relevance strains the bounds of Fed. R. Civ. P. 26(g), requiring an attorney signing a document request to certify that it is "consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law." Fed. R. Civ. P. 26(g)(1)(B)(i); (*See* Exh. D).

Likewise, jointly training the predictive coding software, as Plaintiffs demand, would grant Plaintiffs access to Biomet's non-relevant documents that would not otherwise be discoverable. In addition, requiring joint training of the predictive coding software is improper because it encroaches on the producing party's work product. Jointly training the predictive coding software is indistinguishable from jointly training the producing party's contract attorneys and associates or jointly compiling the instruction manual for the review. With traditional manual review, neither the Federal Rules nor any other authority requires parties to conduct joint training in this manner. There is also no requirement to prove that the training was successful to alleviate the requesting party's

concerns that not all responsive documents were identified. *See, e.g., Larsen v. Coldwell Banker*, 2012 U.S. Dist. LEXIS 12901, at *21 (citing The Sedona Conference*, The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production* cmt. 6.a. (2d ed. 2007) ("A producing party should not be required to undertake more heroic efforts merely because the party seeking discovery is suspicious of the efforts undertaken by the producing party.")). Identifying responsive documents is typically within the producing party's control, governed by that party's discovery obligations, and protected as attorney work product. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *see also FDIC v. Johnson*, No. 2:12-cv-00209 (KJD) (PAL), 2013 U.S. Dist. LEXIS 40092, at *10 (D. Nev. Mar. 21, 2013) ("[a]ll searches, filters, document review, coding and tagging of documents is the work product of the attorney and firm performing the work in the database and is not available to any other party."). This principle is consistent with the work product protections created by the Supreme Court in *Hickman v. Taylor*:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. *Hickman v. Taylor*, 329 U.S. at 510.

Requiring a party to produce non-relevant documents and waive work product protections to use technology-assisted review risks deterring widespread adoption of the software and encourages parties using it to not disclose that they are doing so. *See* NYLJ Article ("Whether this transparency [in the predictive coding process] will remain a requirement is the subject of current debate given the fact that the types of information made available in a transparent process (e.g., nonrelevant documents, seed sets) are generally not made available in a linear review where only the results, not the process, are provided.").

### 4. Joint training of the predictive coding software is not required by case law.

Joint training has already proved to be a costly endeavor in *Da Silva Moore*, an early case involving technology-assisted review. In *Da Silva Moore*, the parties agreed that the training would be conducted jointly but then could not agree on one fifth of the responsiveness calls (3,300 out of 15,000). (*See* Exh. M, Apr. 25, 2012 Conference Transcript before Hon. Andrew Peck at 16:25– 17:14, 20:23–21:5, *Da Silva Moore v. Publisis Groupe*, No. 11-cv-1279 (ALC)(AJP) (S.D.N.Y.)). These disputes caused costly production delays, additional briefing, and court hearings.

Another example is *In re Actos*, a products liability multi-district litigation involving a diabetes medication. *In re Actos (Pioglitazone) Prods. Liab. Litig.*, MDL No. 6:11-md-2299 (W.D. La.). In *Actos,* the parties agreed on, and the court entered, a comprehensive protocol for the use of technology-assisted review, which included requirements that each party select three "experts" to jointly train the technology-assisted review software. (*See* Exh. N, Case Management Order: Protocol Relating to the Production of Electronically Stored Information ("ESI") at 7, dated July 27, 2012). The parties in *Actos* elected to participate in this process. But an unwilling party, such as Biomet, should not be required to follow the same protocol, which involves unnecessarily paying six individual "experts" to train software that could instead be trained by one Biomet attorney that is familiar with the claims and defenses in the litigation.

Despite Plaintiffs' assertion that joint training is routine, of the four published cases implementing technology-assisted review only the two described above involved joint training. In *Global Aerospace,* the defendants moved for permission to use technology-assisted review or to require plaintiffs to pay for traditional manual review. *Global Aerospace, Inc. v. Landow Aviation, L.P.*, No. CL 61040, 2012 Va. Cir. LEXIS 50, at *50 (Va. Cir Ct. April 23, 2012). Plaintiffs objected, arguing that technology-assisted review is not as effective as human review. The court permitted

defendants to use technology-assisted review, and did not require joint training of the software. Instead, the court gave plaintiffs an opportunity to question the "completeness of the contents of the production or the ongoing use of technology-assisted review." *Id.*

The other case using technology-assisted review, but not joint training, was *Gabriel Technologies Corp. v. Qualcomm Inc.*, No. 08-cv-01992, 2013 U.S. Dist. LEXIS 14105 (S.D. Cal. Feb. 1, 2013). There, the parties agreed to search terms, which, like here, were used to create a set of potentially responsive documents that were then sorted by likelihood of responsiveness and manually reviewed for relevance, confidentiality, and privilege. (*See* Exh. O, Defendants Qualcomm, Incorporated, Snaptrack Inc., and Norman Krasner's Motion for Attorneys' Fees, dated October 12, 2012, at 21, filed in *Gabriel Technologies Corp. v. Qualcomm Inc.*, No. 3:08-cv-01992 (AJB) (MDD) (S.D. Cal.), Dkt. No. 332-1). After prevailing on the merits, defendants moved for attorneys' fees including technology-assisted review costs, arguing that a traditional manual review would have cost far more. The court awarded defendants $2.8 million in vendor costs finding the "decision to undertake a more efficient and less time-consuming method of document review to be reasonable under the circumstances." 2013 U.S. Dist. LEXIS 14105, at *35.

## III.   BIOMET IS NOT REQUIRED TO CONDUCT DISCOVERY BY PLAINTIFFS' PREFERRED METHOD.

Biomet, as the producing party, is "best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." *See* The Sedona Conference, *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production,* Principle 6 (2d ed. 2007). A court within the Seventh Circuit recently relied upon Sedona Principle 6 in resolving a similar dispute. *See Kleen Prods., LLC v. Packaging Corp. of Amer.*, No. 1:10-cv-05711, 2012 U.S. Dist. LEXIS 139632 (N.D. Ill. Sept. 28, 2012). In that case, defendants made a large document production using traditional review and

keywords. Plaintiffs moved to compel defendants to redo the production using technology-assisted review. Like here, plaintiffs argued that keyword searches would capture only 25%, whereas technology-assisted review would capture 75% of relevant documents. 2012 U.S. Dist. LEXIS 139632, at *17–18. Unsurprisingly, defendants argued against redoing their production, responding that keywords are a commonly used way to find relevant documents and that their search term methodology was tested, validated, and implemented in a manner that is consistent with the case law. *Id.*

The court conducted a hearing with testimony from multiple witnesses for each side, including discovery vendors and experts. At the end, Magistrate Judge Nolan directed the parties to consider Sedona Principle 6 and urged them to find a manner to refine or supplement defendants' keyword searches in a way that provides the plaintiffs with reasonable assurance that they are receiving a high percentage of responsive documents without requiring defendants to start over. 2012 U.S. Dist. LEXIS 139632, at *18–19. The plaintiffs eventually agreed to withdraw their demand that defendants apply technology-assisted review on documents collected in response to discovery requests served before October 2013, and to meet and confer regarding the appropriate search methodology for documents requested thereafter. *Id.* at 19.

Here, Biomet already has attempted to provide Plaintiffs with the types of reasonable assurances urged in *Kleen Products*. Although not obligated to do so, Biomet offered Plaintiffs several ways to participate in the technology-assisted review process during the parties' meet and confers. To address Plaintiffs' concerns in a manner that does not require restarting discovery, Biomet offered to add relevant documents provided by Plaintiffs to the data set and use them to train the predictive coding software in the remaining iterations. Biomet also offered to produce a random sample of non-responsive documents and the null set sample used to evaluate the effectiveness of Biomet's search terms, and to use any responsive documents that were missed to train the predictive

coding software in the remaining iterations. In addition, Biomet offered to share the recall (the proportion of relevant documents identified during a review) and precision (the proportion of identified documents that are relevant) of the search and review process upon completing the iterative review and meet and confer regarding whether these rates are sufficient or require continuing review.

These compromises should have been sufficient to provide Plaintiffs and their vendor, Douglas Forrest, who specializes in "validation methodology for Defense-side use of predictive coding for their productions—*in other words, keeping them honest*," with reasonable assurance that they are receiving a high percentage of responsive documents. (*See* Exh. P, webpage titled *Meet Plaintiff eDiscovery Expert Douglas E. Forrest, Esq.*, *available at* http://www.ilsteam.com/about/leadership-team/doug-forrest/ (last visisted April 1, 2013)). But Plaintiffs have declined these offers and continue to insist that Biomet restart discovery and conduct it in Plaintiffs' preferred way. Biomet should not be required to do so. As the producing party, which is presumed to "bear the expense of complying with discovery requests," Biomet should also be permitted, as provided by Sedona Principle 6, to "evaluate the procedures, methodologies, and technologies appropriate for … producing their own electronically stored information." *See Grant v.* Homier, No. 3:07-cv-00116 (JVB), 2007 U.S. Dist. LEXIS 63083, at *13 (N.D. Ind. Aug. 24, 2007).

## IV.   THE BURDEN OF STARTING OVER IS NOT PROPORTIONAL TO THE BENEFIT.

The goal of the Federal Rules of Civil Procedure is to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. To achieve this goal, discovery should be guided by the Fed. R. Civ. P. 26(b)(2) principle of proportionality, which provides that a court must limit discovery that may otherwise be allowed if it determines that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of

the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii); *see also Kleen Prods.*, 2012 U.S. Dist. LEXIS 139632, at *29 (citing *In re IKB Deutsche Industriebank AG*, No. 09-cv-07582, 2010 U.S. Dist. LEXIS 35924, at *15 (N.D. Ill. Apr. 8, 2010) ("The Rule 26 proportionality test allows the Court to limit discovery if it determines that the burden of the discovery outweighs its benefit.")).

"The 'metrics' set forth in Rule 26(b)(2)(C)(iii) provide courts significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources." *Tamburo v. Dworkin*, No. 04-cv-03317, 2010 U.S. Dist. LEXIS 121510, at * 7 (N.D. Ill. Nov. 17, 2010) (citing The Sedona Conference, *The Sedona Conference Commentary on Proportionality in Electronic Discovery*, 11 Sedona Conf. J. 289, 294 (2010)); *see also Takacs v. Union County*, No. 08-cv-00711 (KSH) (MAS), 2009 U.S. Dist. LEXIS 87632, at *3 (D.N.J. Sept. 14, 2009) ("The purpose of this rule of proportionality is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry.")

Plaintiffs assert that this dispute is procedurally within the scope of the Stipulated Order Regarding Production Format of Parties' Electronically Stored Information, which provides that "the parties' computer experts will informally cooperate to discuss procedures or protocols to facilitate the identification, retrieval and production of computerized information." (*See* March 18, 2013 Tr. at 5:1–12 (citing Case Management Order, Exh. B, Principles Relating to the Discovery of Electronically Stored Information, at 15)). This clause is inapplicable here, however, because Plaintiffs' proposal directly contradicts its purpose, which is to "expedite discovery of relevant electronic evidence and reduce costs." *Id.*

27

Fed. R. Civ. P. 26(b)(1) explicitly recognizes that all discovery is subject to the proportionality limitations imposed by Rule 26(b)(2)(C). This provision is further underscored by Principle 1.03 of the Seventh Circuit Pilot Program, which emphasizes that this proportionality standard "should be applied in each case when formulating a discovery plan" and that "[t]o further the application of the proportionality standard in discovery, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as practicable." *See* Case Management Order, Exh. A, Principles Relating to the Discovery of Electronically Stored Information, Principle 1.03.

The party opposing discovery has the burden of showing why the requested discovery should not be permitted. *See Countryman v. Cmty. Link Fed. Credit Union*, No. 1:11-cv-00136, 2012 U.S. Dist. LEXIS 47681, at *6 (N.D. Ind. Apr. 3, 2012) (citing *Graham v. Casey's Gen. Stores*, 206 F.R.D. 251, 254 (S.D. Ind. 2002); *see also* Fed. R. Civ. P. 26, Advisory Committee Notes, 2006 Amendment, Subdivision (b)(2). Once the resisting party meets its burden, it shifts to the requesting party to show that the information is relevant and necessary. *Conn. General Life Ins. Co. v. Earl Scheib, Inc.*, No. 11-cv-00788, 2013 U.S. Dist. LEXIS 16234, at *4 (S.D. Cal. Feb. 6, 2013).

Here, the burden of spending up to $8 million in costs and additional fees and delaying discovery by over a year far outweighs the benefit of running predictive coding on the entire collection, particularly when the 15.5+ million documents at issue only contain several thousand relevant documents. (Clark Decl. ¶ 13); *see. e.g., Adair v. EQT Prod. Co.*, No. 1:10-cv-00037, 2012 U.S. Dist. LEXIS 75132, at *12 (W.D. Va. May 31, 2012) ("the court may consider the cost of review of ESI for privileged or responsive information in deciding whether discovery imposes an undue burden or cost on a responding party"); *Rodriguez-Torres v. Gov't Dev. Bank of P.R.*, 265 F.R.D. 40, 44 (D.P.R. 2010) (finding that the ESI requested is not reasonably accessible because of the undue burden and cost of production and review); Sedona Proportionality Principles, Principle 4

("Extrinsic information and sampling may assist in the analysis of whether requested discovery is sufficiently important to warrant the potential burden or expense of its production."). Any benefit Plaintiffs receive from this discovery would be far outweighed by the burden on Biomet to process, review, and produce these documents. *See, e.g., In re FedEx Ground Package Sys. Emp't Practices Litig.,* No. 3:05-md-00527, 2007 U.S. Dist. LEXIS 16205, at *17 (N.D. Ind. Mar. 5, 2007) (citing *Sabratek Liquidating LLC v. KPMG LLP,* No. 01-cv-09582, 2002 U.S. Dist. LEXIS 21858, at * (N.D. Ill. 2002) (indicating discovery request will not be allowed where it potentially results in large scale production)); *Takacs v. Union County,* 2009 U.S. Dist. LEXIS 87632, at *3 ("while discovery and relevance may be broad, it is not boundless").

Given the low responsiveness rate of the documents at issue, Plaintiffs cannot show good cause for requesting a technology-assisted review of these documents, as required by Fed. R. Civ. P. 26(b)(2)(B). *See, e.g., Larsen vs. Coldwell Banker,* 2012 U.S. Dist. LEXIS 12901 (C.D. Ca. Feb. 2, 2012) (denying plaintiffs' motion to compel re-production because plaintiffs failed to prove that the defendants e-discovery efforts were unreasonable). "Courts should not countenance fishing expeditions simply because the party resisting discovery can afford to comply." G*en. Steel Domestic Sales, LLC v. Chumley,* No. 10-cv-01398, 2011 U.S. Dist. LEXIS 63803, at *9 (D. Colo. June 15, 2011); *Thermal Design, Inc. v. Guardian Bldg. Prods.,* No. 08-cv-00828, 2011 U.S. Dist. LEXIS 50108, at *2–5 (E.D. Wis. Apr. 20, 2011) (same).

If Plaintiffs believe that the less than 1.5% of relevant documents within the 15.5+ million are indispensable, they should be required to pay for the processing, predictive coding, review and production costs that will be required to find them. *See Grant v. Homier,* 2007 U.S. Dist. LEXIS 63083, at *13 ("when the request violates the Fed. R. Civ. P. 26(b)(2)(C) proportionality test, the Court may condition discovery on the requesting party's payment of costs for production"); *see also Rowe Entm't, Inc. v. William Morris Agency, Inc.,* 205 F.R.D. 421, 428 (S.D.N.Y. 2002).

Cost shifting is particularly applicable in an asymmetrical litigation like this MDL, when the Plaintiffs have few, if any, documents, while Defendants have millions. *See Boeynaems v. La Fitness Int'l*, 285 F.R.D. 331, 335 (E.D. Pa. 2012) ("economic motivation and fairness are relevant factors in determining cost shifting of disputed discovery burdens") (citing legal literature and treatises regarding cost allocation in asymmetrical cases). As noted by the Plaintiffs' e-discovery vendor, "if you don't have very much to produce, and your needs center on how to digest and make productive use of the materials being produced to you, everything changes." (*See* Exh. G, *Asymmetrical Plaintiffs Can Hit the eDiscovery Sweet Spot*). Cost shifting would realign the parties' incentives to expedite discovery of relevant documents and reduce costs.

## CONCLUSION

Over the past year, Biomet has conducted discovery in a reasonable, effective, and transparent manner. Restarting discovery now is unnecessary, prohibitively expensive, and inconsistent with the purpose of an MDL.

Dated: April 4, 2013

/s/ Erin Linder Hanig

John D. LaDue
Erin Linder Hanig
LADUE CURRAN & KUEHN LLC
200 First Bank Building
205 West Jefferson Boulevard
South Bend, IN 46601
Tel: (574) 968-0760
Email: jladue@lck-law.com
Email: ehanig@lck-law.com

John D. Winter
Jenya Moshkovich
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
Email: jwinter@pbwt.com
Email: jmoshkovich@pbwt.com
*Attorneys for Defendants*

30

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 4, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which provided electronic service upon all counsel of record.

*/s/ Erin Linder Hanig*
Erin Linder Hanig (29113-71)