# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION


IN RE:  BIOMET M2a-MAGNUM                CAUSE NUMBER
HIP IMPLANT PRODUCTS LIABILITY           3:12MD02391
LITIGATION


MONDAY, MARCH 18, 2013


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT L. MILLER, JR.


- - - OOO - - -


*DEBRA J. BONK*
*Federal Certified Realtime and Registered Merit Reporter*
*United States District Court*
*204 South Main Street - Room 323*
*South Bend, Indiana 46601*
*debra_bonk@innd.uscourts.gov*
*574-246-8039*


*Proceedings reported in machine shorthand.  Transcript*
*produced by computer-aided transcription, Eclipse.*

1                              **APPEARANCES**

2     **APPEARANCES**

3     **For Plaintiffs:**

4     **MR. THOMAS R. ANAPOL**
      **MR. ROBERT DASSOW**
5     **MR. RICHARD ARSENAULT**
      **MS. ANNE ANDREWS**
6     **MR. JOHN THORNTON**
      **MS. JENNIFER HOEKSTRA**
7     **MR. PAUL CORDELLA**

8     **(see docket for addresses)**

9

10    **For Defendant:**

11    **MR. JOHN D. WINTER**
      **MR. JOHN LaDUE**
12    **MS. ERIN LINDER HANIG**
      **MR. BLAINE DART**
13
      **(see docket for addresses)**
14

15

16

17

18

19

20

21

22

23

24

25

MARCH 18, 2013 HEARING - CERTIFIED

```
 1              THE COURT:  Good afternoon.

 2         This is the March status conference in MDL2391.

 3              Lead and liaison counsel and I spoke in chambers

 4    beforehand to just iron out what we're doing here, and there

 5    was a couple of agreements reached that I'll put on the

 6    record at the close of today's conference.

 7              First, I'm going to work off my sign-in sheet to say

 8    who all's here, and if I don't call your name, please let me

 9    know.

10              First for the Plaintiffs, Mr. Anapol.

11         MR. ANAPOL:  Good afternoon.

12         THE COURT:  Anne Andrews.

13         MS. ANDREWS:  Good afternoon Your Honor.

14         THE COURT:  Richard Arsenault.

15         MR. AUSENAULT:  Good morning.

16         THE COURT:  Robert Dassow.

17         MR. DASSOW:  (Indicating.)

18         THE COURT:  And then names we have to add to our

19    list.

20              John Thornton.

21         MR. THORNTON:  Here, Your Honor.

22         THE COURT:  Paul Cordella.

23         MR. CORDELLA:  Good afternoon, Judge.

24         THE COURT:  Good afternoon.

25              Jennifer Hoekstra.
```

MARCH 18, 2013 HEARING - CERTIFIED

 1          MS. HOEKSTRA:  Here, Your Honor.

 2          THE COURT:  And Blaine Dart.

 3          MR. DART:  Yes, sir.

 4          THE COURT:  Okay.  And for the Defendants then, we

 5   have John Winter.

 6          MR. WINTER:  Good afternoon Your Honor.

 7          THE COURT:  Good afternoon.

 8          John LaDue.

 9          MR. LADUE:  Judge.

10          THE COURT:  And Erin Linder Hanig.

11          MS. LINDER HANIG:  Judge.

12          THE COURT:  I have your, if I can find it, again --

13   I had the agenda that you folks sent in, and I have promptly

14   attached it to something else.

15          So, Mr. Anapol, why don't I just turn to you, first,

16   and let you address where we stand.

17          MR. ANAPOL:  Your Honor, on behalf of the

18   Plaintiffs, Richard Arsenault is here to argue about the ESI

19   predictive coding, which is the first item on the agenda.

20          I assume that's where Your Honor wants to go, start

21   with the ESI protocol?

22          THE COURT:  Yes.

23          MR. ARSENAULT:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. ARSENAULT:  Richard Arsenault.

MARCH 18, 2013 HEARING - CERTIFIED

1          Not so much here to argue, but just to give Your

2    Honor the framework of where we are, where we think we're

3    going, and what we're trying to do here, and this all

4    procedurally falls under the rubric of CMO Number 2, Exhibit

5    B, Page 15, Section 5A where to expedite discovery of

6    relevant electronic evidence and reduce costs -- so those

7    are the focuses, expedite discovery, reduce costs -- the

8    parties' computer experts will informally cooperate and

9    discuss procedures or protocols to facilitate

10   identification, retrieval, and production of computerized

11   information.  This responsibility shall be continuing,

12   unless otherwise ordered by the Court.

13          We've been engaging in that process.  We've had

14   somewhere between five and ten conference calls with our

15   vendor, which is ILS, on the call, and it seems that we've

16   reached an impasse.  We offered to bring our experts here

17   today, and the tutorial that you would have gotten from them

18   would have been much greater than what you're going to get

19   from me right now, but I will do the best I can.  I will

20   give Your Honor what I call the Reader's Digest version.

21   I'm assuming Your Honor knows what that this.

22          I was talking to some associates the other day and

23   said, "Would you give me the Reader's Digest version?"

24          And they said, you know, "What could that possibly

25   be?"

MARCH 18, 2013 HEARING - CERTIFIED

1      Four main points, Your Honor.

2      The Plaintiffs need to meaningfully participate in

3  how documents are collected and in what format they are

4  produced.  It's got to be a collaborative process, Point

5  Number One.

6      Point Number Two, the Defendants pre-MDL production,

7  whatever they produced before this MDL, Your Honor's

8  court-appointed PSC had no input in any of that.

9      Number Three, predictive coding should be used, as

10  opposed to search terms, and this is where I'll give you the

11  brief tutorial, if you don't mind.

12      And then last, predictive coding requires a

13  collaborative effort to train the software.

14      So the two major concepts, Your Honor, as I

15  understand them here.  For years, we've collected documents

16  using what's generally referred to as search terms.

17  Typically, what happens, the Defendants suggest terms, and

18  then the Plaintiffs suggest terms, and you try to reach some

19  agreement with regard to those terms.  As you can imagine,

20  the Plaintiffs are in the embryonic stages of the case and

21  are at quite a disadvantage.  They don't understand the

22  language.

23      Search terms basically look at massive documents and

24  try to find words, okay.  So if we had, for example, a case

25  involving dogs, we'd be looking for the word "dog", "puppy",

MARCH 18, 2013 HEARING - CERTIFIED

1    "canine".  That's search terms.

2         Now, fast forward.  In more modern times now, we

3    have what's called predictive coding.  It's concept

4    searching.  It's artificial intelligence.  So as opposed to

5    just mindlessly going through documents looking for

6    "canine", "puppy", "dog", if the hottest document in that

7    pile was "man's best friend," search terms wouldn't find

8    that.  Concept searching would.

9         The way I also try to understand this or explain it

10   is spam filters.  They learn over time what you, Your Honor,

11   don't want coming into your computer.  Or this Pandora deal

12   with regard to music where you give thumbs up or thumbs

13   down, it learns the music you want at the end of the day.

14        The studies that I've seen suggest that when you do

15   search terms to look at documents -- and this is assuming

16   you have the most robust set of search terms -- you might

17   get up to twenty-four percent of the relevant documents.

18   Whereas, with predictive coding, you can get as much as

19   ninety percent of the relevant documents.

20        So our position is that we should be using

21   predictive coding and that it has to be a collaborative

22   process.

23        The other part to the predictive coding is you

24   train -- you train -- the software.  Much like your spam

25   filter begins to learn what comes in, what doesn't come in,

MARCH 18, 2013 HEARING - CERTIFIED

1   you have to train that, so you have to show the software
2   that these are the relevant documents, these are an example
3   of relevant documents.  It's called seeding.  These are the
4   irrelevant documents.  If you see something like this, we
5   don't want it.  If you see something like this, we want it.
6        That's about as high as I can go on my pay grade
7   with regard to the process.  Happy to answer questions, but
8   those are the points.
9        THE COURT:  Obviously, one of the things that I have
10  to take into account are expense and burden.
11       Can you help me with that?
12       MR. ARSENAULT:  The studies we've seen -- and there
13  was an article that just came out today in the New York Law
14  Journal -- they stand for the proposition that this is a
15  more efficient and less expensive process, and, just today,
16  the New York Journal had an article that goes into that.
17  The Journal also noted five different cases, including the
18  **Actos** MDL where I served as lead counsel, where this
19  predictive coding process is being used.
20       THE COURT:  Thank you, sir.
21       MR. ARSENAULT:  Appreciate it.
22       THE COURT:  Who speaks?
23       Mr. Winter.
24       MR. WINTER:  Your Honor, we put together a little
25  bit of a PowerPoint for you because there's a little bit of

1    background that needs to be covered here, and what we're

2    here to tell Your Honor is we started a process which

3    involves search terms and predictive coding.  We've been

4    saying for at least six months, "If you have other search

5    terms you want us to employ, give them to us.  We'll do it."

6    We've engaged in a dialogue on how the predictive coding is

7    being done, and we've gotten nothing.

8         So let's start when we started to collect documents

9    in April of 2012, and we did a very broad search and

10   collected approximately twenty million documents.  So if a

11   document is three pages or five pages, that's the breadth of

12   what we collected, because we went to a lot of shared places

13   at Biomet and said, "We need everything in orthopedics to

14   pull out the hips."  We took everything in hips to pull out

15   the metal on metal.

16        So you had this big group of documents to which

17   search terms were applied, and you'll see search terms have

18   been used very consistently over the past twenty years.  And

19   what it did, the search terms reduced the 19.5 million

20   documents to approximately four million documents.  And then

21   when you take out duplication, which is a standard thing you

22   did, we ended up with 2.5 million documents.  And then to

23   that group, search terms are applied, and this process takes

24   time.  And as of last week, we had produced close to two

25   million pages of documents from that set of 2.5 million

1  documents.

2        And we had said at the last conference, Your Honor,

3  that we were going to be done with our document production

4  by July of this year, and that's when you said you thought

5  you wanted depositions starting in August, which made sense.

6        We're here to tell you, Judge, that if -- we'll go

7  through what the Plaintiffs want, but we will lose at least

8  nine months, if not a year, to go back to Square One.  And

9  it's not like we're saying, "Just do it our way."  We've

10 offered, along the way, ways for them to get involved in the

11 predictive coding process that we're in.  But if we go back

12 to not use search terms and go back to that big pile of

13 19.5 million documents, it's going to take us a year.

14        So search terms were very good to help narrow it

15 down to something that looked like metal on metal, and we've

16 said -- we gave everyone the list of our search terms about

17 seven or eight months ago.  We said, "Here are the

18 twenty-eight custodians that we collected from.  Here is the

19 department and shared files we collected from," and, we

20 said, "Yeah, you might need to think about this for a

21 while."

22        But we've given lawyers on the Plaintiffs' Steering

23 Committee, lawyers in individual cases, you know, more than

24 a million pages of production so they could look at it and

25 say, "Why didn't you search for this?  Why didn't you

MARCH 18, 2013 HEARING - CERTIFIED

1    collect from this custodian?"

2            And we've said, multiple times, "We're more than

3    willing to do that."

4            So we have both a timing problem, Your Honor, and a

5    cost problem.  We have spent approximately $1 million -- and

6    that's not counting the review time for lawyers and other

7    people to look for privileged documents, because you still

8    have to do that -- just to get the production to where it

9    is, to collect the documents, to get it in the right format

10   so it's searchable, run the search terms, run the predictive

11   coding.  It's going to cost us at least an extra $3 million

12   to go back to Square One.

13           Now, how did this predictive coding work?  Well, as

14   my good colleague explained to you, it's a computer,

15   artificial intelligence process, and someone sits down and

16   figures out, as they look at documents, what's relevant, and

17   the computer learns and then searches for those types of

18   documents.

19           We, both in writing and in meet and confers, said to

20   our good colleagues, "We will give you sets of documents

21   which have been determined to be nonresponsive" -- so

22   predictive coding has looked at it and said nonresponsive --

23   "we will give you sets of those, and you can randomly select

24   those things -- we all have very smart vendors on both

25   sides -- and you can review them.  And if you review them

1  and you see documents that you think are responsive, we can

2  add that to what the predictive coding system is doing

3  already."

4          So we can make this interactive.  We can have them

5  look at, you know, how many sets of nonresponsive documents

6  that they want to and satisfy themselves that it is

7  reasonably responsive, or if they want to add to it, it

8  becomes a partnership, and we can have it learn.  It can go

9  back and look at the old stuff, and if there's more new

10  things to pull out, there will be more new things to pull

11  out.

12          But the notion that we have to stop and go back to

13  Square One and go look at these 19.5 million documents is

14  just not warranted, not permitted, we think, under the

15  rules, because it's got to be a reasonable thing and there's

16  got to be proportionality.

17          And I think what's important Judge is, when we were

18  here in February -- I know I was very late -- we were

19  talking about getting depositions started in August.

20          And as part of a meet and confer in January, our

21  good colleagues said, "We want more meta data in the

22  documents you're producing."

23          I think we had twenty-four, and they wanted us to

24  give thirty-seven fields of meta data.

25          We said, "Fine."

1    We went back to what we had already produced, had

2    the meta data added to it, produced that.

3    The next production we did last week had the new

4    meta data in it.  We had this discussion in January.

5    Three days after we appear in front of you, we get

6    this letter with 184 document requests saying, "Sorry.

7    We're going back to Square One.  We're doing everything

8    over."

9    Now, if you wanted us to do everything over, then

10   why'd you ask us the month before to just tweak the

11   production a bit to add these meta data fields?"

12   We didn't think it was really called for, but our

13   good colleagues wanted it, so we did it at our expense.

14   **THE COURT:**  This going back to Square One, as you're

15   describing it, is that the gist of the disagreement between

16   you and the Plaintiffs or is there more to it than that?

17   **MR. WINTER:**  Well, I think that's the fundamental

18   disagreement.

19   **THE COURT:**  All right.

20   **MR. WINTER:**  Then the other part would be, we said,

21   "Give us more search terms," and we haven't gotten them.

22   "You want more custodians, we'll look at it.  You want to

23   look at documents that the computer said is nonresponsive to

24   see if you want to add that and reconfigure the algorithm

25   for the computer, we're happy to do that."

MARCH 18, 2013 HEARING - CERTIFIED

1    We've had no back and forth because what they say

2  is, "No search terms, and we start everything over," so

3  that, you know, becomes the real road block here.

4    And we've been very transparent.  We do want to move

5  these cases along, Judge.  When you said, "Do you want to

6  start depositions in August," you know, we're going to get

7  the document production done so that there's complete

8  production.

9    Obviously, someone can say, "I want another

10  custodian," and then we have to figure that part out as we

11  go along, but we'd be in a position to start doing

12  substantive depositions.

13    And, you know, we've spent a lot of money to get to

14  where we are, and to have us triple that cost -- forget the

15  lawyer time -- to do that is just not fair and reasonable.

16  And to the extent we're going to go back and re-do lots of

17  discovery, we're going to be asking you -- if that's what

18  they really want, then they should be paying for it.

19    Thank you, Judge.

20    **THE COURT:**  Okay.  Yes, Mr. Arsenault, please.

21    **MR. ARSENAULT:**  Thank you.

22    I guess the fundamental issue at the end of the

23  day -- and I'm sorry that they've spent money.  I'm sorry

24  that they've collected documents.  We are going to have

25  affidavits here from two of the Plaintiffs' counsel, before

1  the MDL, that will stand for the proposition that they said,

2  "Look.  Don't send us anything.  We're going to have to

3  revisit all of this once we get to the MDL," so sorry

4  they've done that.

5       And then, at the end of day, I guess, I have to

6  question the motives associated with going with search terms

7  first versus predictive coding when we know that search

8  terms are going to give us twenty-five percent, at best, of

9  the relevant documents versus predictive coding.

10      They grabbed 19.5 million documents, moved it down

11  somehow -- I don't know -- to four million, then down to

12  2.5, so they've got -- out of their 19.5 million documents,

13  unilaterally moved that to 2.5.  Then on that 2.5, instead

14  of using predictive coding, first, to try to get more

15  relevant documents, they used search terms.  That leaves

16  seventy-five percent of the relevant documents unavailable

17  to the Plaintiffs at the end of the day.  That's the

18  fundamental dispute.

19      Now, with regard to the meta data, you know, with

20  regard to electronically-stored information and these kinds

21  of documents, there are two basic issues, identifying what

22  you need, what's relevant and discoverable, and then, once

23  you do, the format, you know, so that's apples and oranges.

24  To the extent we've reached any agreement with regard to the

25  format and the meta data, that's going to be instructive

MARCH 18, 2013 HEARING - CERTIFIED

 1   with regard to us ultimately identifying what's really

 2   discoverable here, what's relevant.

 3          Thank you.

 4          **THE COURT:**  Thank you, sir.

 5          **MR. WINTER:**  Your Honor.

 6          **THE COURT:**  Mr. Winter.

 7          **MR. WINTER:**  So the record is clear here, predictive

 8   coding was applied to all of those 2.5 million documents.

 9   Search terms weren't used.  Once it got to that level, it

10   was all done by predictive coding, and I think it's

11   instructive, Judge, if you look at --

12          **THE COURT:**  Well, the search terms got you from the

13   19.5 down to the 2.5?

14          **MR. WINTER:**  Correct.

15          **THE COURT:**  And then predictive coding and search

16   terms after that?

17          **MR. WINTER:**  No, just predictive coding.

18          **THE COURT:**  Okay.

19          **MR. WINTER:**  Just predictive coding to that 2.5, so

20   the search terms were only used to -- because the way we

21   collected, we have lots of documents on Biomet knees, on

22   Biomet shoulders, on Biomet elbows.  All sorts of documents

23   were collected from regulatory and other functions that

24   applied across multiple product lines, so you had to use

25   search terms to knock out stuff that is not even a hip, and

MARCH 18, 2013 HEARING - CERTIFIED

1    then you had to use search terms so that you weren't talking

2    about ceramic hips.  We were talking about metal-on-metal

3    hips and we're talking about Magnum's hips, so that's -- the

4    broad collection was to use search terms to get to a

5    universe that had metal on metal.

6         And I think it's instructive, Judge, when you look

7    at what we put in those slides, on how courts use search

8    terms, routinely, for lots of reasons, knowing their

9    limitations, but it's like, you know, the ship has sailed on

10   using search terms in discovery.  It's a reasonable and

11   accepted way to do it.

12        And I think, if you look at what our good colleagues

13   said to the MDL Panel on why these cases should be

14   consolidated, for efficiency and that we don't re-do

15   discovery, that's precisely what they're asking you to do

16   here, which is precisely what the Panel, when it

17   consolidated all these cases, said shouldn't happen.

18        **THE COURT:**  Thank you, sir.

19        I do want to try to line this up with the ESI order.

20   I haven't memorized everything we did in the second Case

21   Management Order.

22        I will either get you a ruling this week or we'll

23   contact you and try and set up, perhaps by video or

24   something, a chance for me to hear from your IT experts so

25   that I can get that fuller understanding that Mr. Arsenault

1   talked about, and, again, I think we can do that by video,

2   rather than costing everybody a trip back to South Bend,

3   but, first, I want to see if I could do it based on the

4   ground we've already covered and what I've heard today.

5           I did find my agenda, and I've buried it again.  I

6   have to get better at this.  Here we are.

7           Plaintiffs' Fact Sheets.  I think we agreed we were

8   going to talk about that afterwards.

9           Science information presentation.

10          **MR. ANAPOL:**  Yes, Your Honor.

11          If I may, if you may indulge me, we would like to be

12  heard, you know, again, in some capacity, on the ESI, if we

13  can, just to respond to some of the last comments that

14  Mr. Winter made, to talk about, if necessary, a possible

15  briefing schedule.  So as much as Your Honor is ready to

16  kind of think about moving forward, whether it's off the

17  record in chambers or at some other point, we'd like to

18  respond, and we'd like to just address some more issues with

19  the ESI, if Your Honor will hear us.

20          **THE COURT:**  Well, why don't we do -- I don't know

21  what your calendars look like.  Could we do two weeks for

22  each side to put their positions in writing and identify

23  your disagreements, as you understand it, with the other

24  side?

25          So what would two weeks from today be?  This is the

1    11th.  No, this is the 18th.  So we're into April, and I

2    can't do that math.  April 1st?

3           **MR. DASSOW:**  Yeah, April 1st, I believe.

4           **THE COURT:**  So each side is allowed -- if you don't

5    want to do it, you don't have to do it -- allowed until

6    April 1st to submit, in writing, their positions with

7    respect to the parties' current disagreement concerning ESI

8    coding.

9           And, again, then I will either rule on what you gave

10   me or set something up in pretty short order.  That's why I

11   would like to do it by video, so that we don't have to take

12   the time for people to make the arrangements, or I may be

13   able to go on what I'm given.

14          Science and information presentation.

15          **MR. ANAPOL:**  Yes, Your Honor.

16          Unfortunately, we've got a bit of a dispute with

17   respect to the science and information presentation.  I

18   guess it's protocol more than anything else.  Both sides

19   think it's appropriate.  We're prepared to move forward.

20   It's a question of what that protocol is and who's entitled

21   to present and what's going to be presented.

22          Our fear, again -- and it ties back into the

23   document production at some level -- is that we really don't

24   have the documents we think we need, Number One.  We have

25   been through maybe a sixth of what's been produced already,

 1   and there's a lot of holes in it, and I don't want to

 2   belabor the ESI any more than I have to.

 3        We did meet and confer on the science day and try to

 4   set up parameters.  My sense from the Defendants is they

 5   want to do it sooner rather than later.  They're looking for

 6   May.  We're looking for the Fall.

 7        And, again, even being more specific, one of our

 8   biggest concerns, at this point, is our initial

 9   understanding from Your Honor was to keep it pretty basic to

10   help Your Honor understand the parameters, the science with

11   respect to, I think, metal on metal, generally, the injuries

12   and so forth.  The concern now is the Defendants are

13   suggesting they would like to bring an expert in to help

14   present what's presumably going to be modes of failure, and

15   I'm not sure what else specific to Biomet.

16        We're just not there, and so, at the end of the day,

17   I think we would either ask, if we have to move forward in

18   May, that it be very limited and that they don't have an

19   expert present.  What we would prefer is to have some

20   documents in hand, to have experts look at those documents

21   and be able to have a more -- you know, if we have to go

22   down that road -- more substantive review of those records

23   and delay this science day to the Fall.

24        **THE COURT:**  What do you anticipate as the

25   presentation if we don't have experts?

MARCH 18, 2013 HEARING - CERTIFIED

1      **MR. ANAPOL:** I think that would work better.  I
2  think that we'd be prepared to go, I think, as early as May
3  without experts, and what we would be referencing,
4  specifically, would be metal on metal, generally; I think
5  the modes of failure within the more global view; more
6  specifically, what happens to claimants when they're injured
7  by these metal-on-metal hips.
8      **THE COURT:** So this would be more like what you
9  folks had in your what-is-this-all-about brief in the
10  beginning?
11     **MR. ANAPOL:** I think so.  That would be our sense
12  more so.
13     But to get into the specific modes with respect to
14  Biomet and the differences between Biomet and some of the
15  other metal-on-metal products, we're at a huge disadvantage,
16  because we don't have experts, we don't have the documents
17  yet, we don't have the documents to give to the experts yet,
18  as far as we're concerned, so it's all part and parcel, and
19  we're more than happy to move forward in May, if it's
20  limited.
21     **THE COURT:** Okay.  Mr. LaDue.
22     **MR. LADUE:** Judge, we had pretty close to agreement
23  on certain things.
24     I talked with Mr. Dassow about this, and he
25  suggested each side have an hour-and-a-half.  We think each

**MARCH 18, 2013 HEARING - CERTIFIED**

1    side should have two hours just to make sure the Court has

2    plenty of time to ask questions.  We agreed no witnesses, no

3    arguments.

4         Picking up on Your Honor's comments from our last

5    hearing, you said you didn't want us to make this into a

6    **Daubert** motion, you didn't want it to turn into summary

7    judgment arguments, and we agree with that, and we would be

8    focusing on the basic science supporting the parties'

9    contentions and just factual background information that

10   will assist the Court.

11        It's correct that we would like to have a surgeon,

12   an expert surgeon assist us.  That person can answer

13   questions about the surgical procedures and talk about

14   post-surgical treatment.  We think that's helpful.

15        **THE COURT:**  Let me back, up because I just wrote

16   down what you said before, that you'd agreed to either

17   forty-five or sixty or -- I'm sorry.  Not forty-five --

18   ninety or 120 minutes aside, but then I thought you said you

19   had agreed no experts, no argument.

20        **MR. LADUE:**  I'm sorry.  I said, "No witnesses, no

21   arguments."

22        **THE COURT:**  No witnesses.

23        **MR. LADUE:**  We didn't anticipate having the surgeon

24   take the witness stand and present testimony, just to assist

25   us with our presentation and be available to answer --

MARCH 18, 2013 HEARING - CERTIFIED

```
 1          THE COURT:  Sitting there at counsel table?
 2          MR. LADUE:  Yes.
 3          THE COURT:  But not to speak unless asked by --
 4    unless I ask?
 5          MR. LADUE:  We would probably have them present just
 6    a basic overview of the surgical procedures and then be
 7    available to answer the Court's questions.
 8          THE COURT:  I see.
 9          MR. LADUE:  And then we still -- we still think that
10    May is a good target.
11          I'm not sure what additional document production
12    would do to change either parties' presentation on this just
13    sort of basic background information.
14          THE COURT:  What you're thinking about with this
15    surgeon on surgical procedures, would he or she be comparing
16    procedures necessary for the Biomet product, as opposed to a
17    Zimmer product, or are you talking, generally, generically,
18    how one does it, or simply how one puts in the Biomet
19    product?
20          MR. LADUE:  To explain how the Biomet product is
21    implanted and just sort of step by step through the process
22    and then post-surgical treatment for common complications.
23          THE COURT:  Okay.  So there would be no discussion
24    of anybody else's product?
25          MR. LaDUE:  We hadn't intended on that, not at this
```

MARCH 18, 2013 HEARING - CERTIFIED

1   point.

2        **THE COURT:**  Okay.  Thank you.

3        Mr. Anapol, help me understand where the big area of

4   disagreement is.  I understand the little one.

5        **MR. ANAPOL:**  I just think we're at a disadvantage if

6   they have an expert present and we're not prepared to bring

7   an expert in in May, particularly as it relates to Biomet.

8        And our concern is that, by example, they start to

9   talk about failure modes as it relates to Biomet

10  specifically.  I'm certain they're not going to come in here

11  and talk about the other products.  The issue is metal on

12  metal, generally, and Biomet, specifically.

13       And where we are at a distinct disadvantage is

14  knowing the information that are in those documents,

15  knowing, you know, the differences between Biomet product

16  and another metal-on-metal hip, and we're just at a

17  disadvantage at this point without experts.  And we think,

18  to be on a more level playing ground, if we're either -- if

19  they don't have an expert, I think we're more inclined to

20  not be as concerned with May.

21       **THE COURT:**  Okay.  Let me ask this, putting together

22  the two things that I've heard today.

23       Mr. Winters said that, if I go back to Square One

24  and predictive coding, that it would be many months, perhaps

25  as long as a year, perhaps not, before you would have

1   everything.

2          How does that fit in with what we're talking about

3   here, since you're indicating you need the documents to be

4   ready for science day?

5          **MR. ANAPOL:**  This is the first I'm hearing that to

6   start this process over again would cost three times the

7   process that it already cost them, so I'm not quite sure how

8   that math adds up.

9          I can't imagine that it takes a year.  I would think

10  that it would take months to work, but not a year.  And by

11  the time -- if we are able to go down that road, what we are

12  entirely hopeful and think reality will be is that it will

13  speed up the process on the back end.  So if the predictive

14  coding is accepted, and we are working collaboratively on

15  deciding which documents belong and which don't through the

16  predictive coding process, that that process may take two,

17  three, four months, and then the actual coding is immediate.

18         And, Mr. Arsenault, I don't know if there's anything

19  I'm missing on this, if you wanted to jump in.

20         If Your Honor will hear from him, it's really his

21  area more than mine, but that's my sense, that it will not

22  take a year.  It would be much quicker than that, and, in

23  fact, it would speed up the process long-term.

24         **THE COURT:**  But it would be a matter of months from

25  where we are?

1    **MR. ANAPOL:**  I do believe, as I understand it, that

2  we'd have representatives from both sides together going

3  through specific custodian files to set up the predictive

4  coding.  There may be issues, you know, with meet and

5  confers there where we disagree on what should go, what

6  shouldn't go, but that once that process is worked up, the

7  process on the back end is dramatically faster.

8    **THE COURT:**  Okay.  But your thought is somewhere in

9  the four-month range?

10    **MR. ANAPOL:**  Mr. Arsenault is telling me two to

11  three months.

12    **THE COURT:**  Okay.  All right.  I think maybe it

13  would be -- since there, obviously, is an impact of one on

14  the other, and I've just allowed two weeks to get briefs or

15  letter briefs in on the one, I'd better hold off on that.

16  Obviously, I want to know what we've got before we start

17  getting into discovery disputes, because that's my concern.

18  I think I need to know what you folks are talking about

19  before I can say what the witnesses have to talk about it.

20    So I will hold off on setting science day and

21  figuring out when it should be until I've given you the

22  ruling on the ESI, because there's going to be some impact.

23  Whether it's two months or a year or something in between,

24  there's going to be some impact, so I'm not going to resolve

25  that one today either.

MARCH 18, 2013 HEARING - CERTIFIED

1    How about remand motions.  Maybe I can contribute

2 something there.

3    **MR. ANAPOL:**  Yeah, remand motions.  I don't think

4 there's any disagreement among the parties.  We mentioned

5 this to Your Honor ahead of time.  There are, I think, two

6 cases in which distributors may have been sued, and I need

7 to find out who the Plaintiffs' attorneys are, reach out to

8 them and find out what their wishes are, if they intend to

9 you know, fight or not the remand, and, you know, we haven't

10 really met and conferred, and I think we'll be able to get

11 that one resolved.

12    **THE COURT:**  So would we do well for that to be a

13 five-week period to allow supplemental briefs for the

14 Plaintiffs moving to remand or to withdraw?

15    **MR. ANAPOL:**  That sounds reasonable.

16    **THE COURT:**  That would give you that two weeks we

17 talked about in chambers, okay.

18    And we did talk about multi-plaintiff cases to be

19 severed.  And remind me because I didn't write this down.

20    Is that where you need to talk to the Plaintiffs'

21 attorneys first?

22    **MR. ANAPOL:**  I think it's underway.  We may have to

23 make sure that it's getting done.  We're in full agreement

24 with the Defendants.  The few complaints need to be severed.

25 Whether they have or haven't, I don't know, but we'll find

MARCH 18, 2013 HEARING - CERTIFIED

1   out who they are and assist the Defendants in having them

2   severed.

3        **THE COURT:**  So if I use that on that five-week --

4   no, you're not looking forward to the --

5        **MR. WINTER:**  I think, Judge, your prior order,

6   actually, set in place the timing of these, so I don't think

7   you need any further orders.  You wanted the parties to

8   identify for you the cases that would be subject to the

9   order, which we have now done, so I think whatever the time

10  that you set in your order thereafter doesn't need to be

11  adjusted.

12       **MR. ANAPOL:**  I think Mr. Winter's correct.  I don't

13  have it in front of me.  I don't want to, you know,

14  jeopardize some Plaintiffs that were unaware, for whatever

15  reason.  The parties can work together, Your Honor.  I don't

16  know that we need your involvement.  We'll make sure it

17  happens.

18       **THE COURT:**  Well, I think you need my involvement to

19  order them severed, so I think I've got to do that and give

20  them all new cause numbers and that sort of thing.

21       **MR. ANAPOL:**  Okay.

22       **THE COURT:**  So we'll get on that.

23       Let me look at my notes to see if there was anything

24  else I wanted to add.

25       One thing we did talk about in chambers is that

1    there are some pending motions, some of them directed only

2    at parties other than Biomet and a full motion to dismiss.

3         Do we have those cause numbers now?  Are they at

4    fingertip or do --

5         **MR. WINTER:**  Yes, Your Honor.  We handed a sheet to

6    both our colleagues and your staff.

7         **THE COURT:**  Okay.  So we will attach this as Exhibit

8    A to the memorial of today's conference and say that, in

9    these cases, the Plaintiffs are afforded -- what is five

10   weeks from now?  Let's see.  Two weeks was April 1st, so

11   that should be April 22nd -- afforded until April 22nd

12   within which to respond to the pending motions, and we'll

13   move from there and see who responds.

14        **MR. WINTER:**  And on the motions to transfer that are

15   going to be on Exhibit A, Your Honor, we are going to

16   withdraw those motions without prejudice.

17        **THE COURT:**  Okay.  So in what we have as Cause

18   Number 12CV672, which came to us from the Northern District

19   of California -- I'm sorry.  I missed the one at the top --

20   12CV586, which also came to us from the Northern District of

21   California, and 12CV724, which came to us from the District

22   of New Jersey -- did I miss any?  Oh, I missed several.  Let

23   me start over.

24        The motion to transfer is withdrawn in the following

25   one, two, three, four, five --

1        **MR. WINTER:**  I believe it's five, Your Honor.

2        **THE COURT:**  -- 12CV586, **Hales versus Biomet**

3   **Orthopedics**; 12CV617**, Wade versus Biomet**; 12CV619; **Hanson**

4   **versus Biomet**; 12CV672**, Chandler versus Biomet**; and 12CV724,

5   **Anker versus Biomet**.  We'll just show those as withdrawn at

6   this point.

7        **MR. WINTER:**  Yes, Your Honor.  Thank you.

8        **THE COURT:**  With respect to the others on this list

9   then, the motions to dismiss -- I guess this has the two

10  remand motions, also, where the Plaintiffs would be

11  responding or at least to let -- not responding, but to let

12  us know whether they wish to maintain them, and they shall

13  have until April 22nd within which to do that.

14       Anything in addition or anything we covered in

15  chambers that I didn't memorialize?

16       **MR. ANAPOL:**  No, Your Honor.

17       We're going to do the Fact Sheet --

18       **THE COURT:**  Yeah.

19       **MR. ANAPOL:**  That's all.

20       **THE COURT:**  Anything for the Defendants?

21       **MR. WINTER:**  No, Your Honor.

22       **THE COURT:**  Okay.  We have a small conference room.

23  If too many of you want to participate, we will adjourn to

24  the jury assembly room.

25       **MR. ANAPOL:**  Your Honor, do you want a date for the

MARCH 18, 2013 HEARING - CERTIFIED

1    next hearing?

2            **THE COURT:**  Oh, yes.  I'm sorry.

3            I would think -- May is a complete mess on my

4    calendar, so I think we would do well to go to -- the last

5    Monday in April would be April 29th.

6            Are you folks coming in on Sunday night?  Is that

7    what you --

8            **MR. ANAPOL:**  We are now, Your Honor, after last

9    month's fiasco.

10           **THE COURT:**  Well, let me go ahead and give you 9:30

11   on the morning of the 29th, if that will work for you then.

12           **MR. ANAPOL:**  Your Honor, it's actually a bit of a

13   problem for Mr. Dassow and me.

14           Does the week before or the week after work for you?

15           **THE COURT:**  The week after does not work.  That's

16   the Circuit Conference.

17           I can do the same thing on April 22nd, 9:30.

18           **MR. ANAPOL:**  That's all right with me.

19           John, any problems?

20           **MR. WINTER:**  Works for me, Your Honor.

21           Does it work for you, Mr. LaDue?

22           **MR. LaDUE:**  Yes, sir.

23           **MS. LINDER HANIG:**  Works.

24           **MR. ANAPOL:**  So what time are we going to start?

25           **THE COURT:**  9:30.

**MARCH 18, 2013 HEARING - CERTIFIED**

1       **MR. ANAPOL:**  All right.  Thank you.

2       **THE COURT:**  Okay.  So we will convene, again, on

3   April 22nd at 9:30, and we will retire to some conference

4   room, depending on how many of us there are, to see if we

5   can hammer out the Plaintiffs' Fact Sheet.

6       **MRS. POTTS:**  All rise.

7                               **(All comply;**

8                               **Proceedings adjourned.)**

9       **THE COURT:**  Okay.  Let's start going through.

10      So as I go through here, I may need some help.

11      What I am looking at is the red-lined version of the

12  Plaintiffs' Fact Sheet that was submitted by Mr. Dassow by

13  e-mail to chambers with copies, of course, to Biomet, and

14  that's what we've all been looking at, and, as I understand

15  it, the parties have either agreed or I agreed for them to

16  the following:

17      With respect to the first paragraph in the

18  instructions on Page 1, the parties are going to rewrite it,

19  the second and third sentences, to indicate that if the

20  Plaintiff is identifying medical records in which an answer

21  can be found, the Plaintiff would be required to identify

22  the provider, the health care provider whose records are

23  being referenced, but will not need to add further dates, et

24  cetera.

25      Do I have that right?

```
 1          MR. DASSOW:  Correct.

 2          MS. LINDER HANIG:  Correct.

 3          THE COURT:  On Page 3, Section I, Questions 4 and 5

 4     will be deleted.

 5          On Section I, Questions 11(a) through (d) on Page 5,

 6     Question 11(a) will become -- well, no.

 7          MS. LINDER HANIG:  That's correct.

 8          MR. DASSOW:  That's correct.  It's going to be "yes"

 9     or "no," yeah.

10          THE COURT:  It will be "yes" or "no", and the rest

11     will be removed, correct?

12          MS. LINDER HANIG:  Correct.

13          MR. DASSOW:  Yes.

14          We might want to keep that "in part," don't you

15     think?

16          MS. LINDER HANIG:  Yeah.

17          THE COURT:  "Or a portion"?

18          MR. DASSOW:  "Or in part," we can keep, Your Honor,

19     if it's -- 11(a) would be, "yes, no, or in part."

20          THE COURT:  So 11(a) will be --

21          MS. LINDER HANIG:  Right, as is.

22          THE COURT:  With (b), (c), and (d) out?

23          MR. DASSOW:  Correct.

24          THE COURT:  There was no objection by the Defendant,

25     as I understand it, to the removal, on Page 7, Category III,
```

MARCH 18, 2013 HEARING - CERTIFIED

 1  Question 9, the second part?

 2        **MS. LINDER HANIG:**  Correct.

 3        **THE COURT:**  So that will be out.

 4        Now, to Page 10, Question 20, toward the bottom, the

 5  question would be modified to, "Have you ever been out of

 6  work for more than thirty consecutive days?"

 7        And then what was 21, modified to 20 here would

 8  be --

 9        **MS. LINDER HANIG:**  I think that's actually in, Your

10  Honor.

11        **MR. DASSOW:**  In.  That's in.

12        Twenty-one is --

13        **MS. LINDER HANIG:**  Is out, Plaintiffs' red line.

14        **THE COURT:**  Oh, that's right, yeah.

15        Twenty-two is out --

16        **MS. LINDER HANIG:**  But, before we get any further,

17  Judge, I think we skipped Page 8 and 9.  Twelve, 13, 14, and

18  18, the "five years" should be "three years."

19        **THE COURT:**  Twelve, 13, 14, and 18, the period that

20  is to be covered is three years, instead of "one" or "five."

21        Thank you.

22        **MR. DASSOW:**  Yeah.

23        Twenty-four, Your Honor --

24        **MS. LINDER HANIG:**  Page 11, Question 24.

25        **MR. DASSOW:**  -- is out.

MARCH 18, 2013 HEARING - CERTIFIED

1          THE COURT:  The original 25, then modified to 24?

2          MR. DASSOW:  Correct.

3          THE COURT:  And the question about third-party

4   funding and losing control will be out.

5          Twenty-six.

6          MS. LINDER HANIG:  The Defendants don't object to

7   that question being stricken.

8          MR. DASSOW:  Yeah, that was taken out.  That was

9   stricken.

10          THE COURT:  So that will be out, okay.

11          MR. DASSOW:  Twenty-eight stays in, and 29 comes

12   out.

13          THE COURT:  Right, 28 in, 29 out.  That's on

14   Page 12.

15          MS. LINDER HANIG:  Correct.

16          THE COURT:  I think that takes us down to the bottom

17   of Page 15.

18          MR. DASSOW:  Correct.

19          MS. LINDER HANIG:  Correct.

20          THE COURT:  The line at 4 will be changed to

21   "alcohol and allergies," and Part B will be deleted, and

22   "food and medication" will be returned to that chart.

23          MR. DASSOW:  Correct.

24          THE COURT:  Ms. Hanig, I'm going to have to ask you

25   to help me on Page 17 where we have a variety of other

1   things that ask them whether they've experienced or been

2   diagnosed.   The chart will be expanded to include answers as

3   to --

4        **MS. LINDER HANIG:**   Symptoms, date of onset, date of

5   diagnosis, and name of physician.

6        **THE COURT:**   Let's see.   Then on Page 22,

7   Question 1(d)(iii) about currently suffering from any

8   injuries, that will be deleted as duplicative of the chart?

9        **MR. DASSOW:**   The chart, uh-huh.

10        **THE COURT:**   And then the expansion of that onto the

11   next page, date of onset, date of diagnosis, and name of

12   physician, those will be deleted, as well.

13        And then of the two questions that were lost as the

14   Plaintiffs moved from an earlier document to this one, the

15   question about past residences will be included.   The

16   question about past institutions of education will be

17   deleted.

18        **MS. LINDER HANIG:**   Correct.

19        **THE COURT:**   Does that cover everything?

20        **MR. DASSOW:**   And then the last one was just the

21   language, whoever had the language, for Request Number One.

22        **THE COURT:**   Oh, that's right.

23        **MR. DASSOW:**   Yeah.

24        **THE COURT:**   On Page 26, Request Number One will be

25   rewritten to read, substantially, as follows:   "With respect

 1   to any injury, illness, and/or disease identified in

 2   response to this Plaintiff Fact Sheet, all medical records

 3   in your possession from any physician, hospital, or

 4   health-care provider."

 5          **MR. DASSOW:**  Okay.

 6          **THE COURT:**  Okay?

 7          **MR. DASSOW:**  Yeah.

 8          **THE COURT:**  And, as I understand it then, Biomet is

 9   going to recast the word processing and forward it then to

10   Mr. Dassow --

11          **MS. LINDER HANIG:**  Correct.

12          **MR. DASSOW:**  Right.  Sure.

13          **THE COURT:**  -- for review?

14          **MR. DASSOW:**  And then we'll submit it jointly.

15          **THE COURT:**  Assuming it survives both of those, I

16   will sign it.

17          Thank you, folks.

18          **MS. LINDER HANIG:**  Thank you, Your Honor.

19          **MR. DASSOW:**  Thank you, Your Honor.

20                        **(Proceedings concluded.)**

21

22

23

24

25

MARCH 18, 2013 HEARING - CERTIFIED

1                          ***

2                      CERTIFICATE

3      I, DEBRA J. BONK, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6      DATED THIS 25TH DAY OF MARCH, 2013.

7                          S/S DEBRA J. BONK

8                          DEBRA J. BONK
                           FEDERAL CERTIFIED REALTIME REPORTER
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25