# EXHIBIT O

1   COOLEY LLP
    STEVEN M. STRAUSS (99153) (sms@cooley.com)
2   JOHN S. KYLE (199196) (jkyle@cooley.com)
    4401 Eastgate Mall
3   San Diego, California  92121
    Telephone:    (858) 550-6000
4   Facsimile:    (858) 550-6420

5   TIMOTHY S. TETER (171451) (teterts@cooley.com)
    JEFFREY S. KARR (186372) (jkarr@cooley.com)
6   Five Palo Alto Square
    3000 El Camino Real
7   Palo Alto, CA  94306-2155
    Telephone:    (650) 843-5000
8   Facsimile:    (650) 857-0663

9   Attorneys for Defendants
    QUALCOMM INCORPORATED, SNAPTRACK, INC. and
10  NORMAN KRASNER

11

12                      UNITED STATES DISTRICT COURT

13                    SOUTHERN DISTRICT OF CALIFORNIA

14                          SAN DIEGO DIVISION

15

16  GABRIEL TECHNOLOGIES                Case No.  08-cv-1992 AJB MDD
    CORPORATION and TRACE
17  TECHNOLOGIES, LLC,                  **DEFENDANTS QUALCOMM,**
                                        **INCORPORATED, SNAPTRACK INC., AND**
18                  Plaintiffs,         **NORMAN KRASNER'S MOTION FOR**
                                        **ATTORNEYS' FEES**
19          v.
                                        Date:      November 30, 2012
20  QUALCOMM INCORPORATED,              Time:      1:30 PM, Courtroom 12
    SNAPTRACK, INC. and NORMAN          Judge:     Hon. Anthony J. Battaglia
21  KRASNER,

22                  Defendants.

23

24

25

26

27

28

                                        **DEFENDANTS' MOTION FOR
                                        ATTORNEYS' FEES
                                        CASE NO. 08-CV-1992 AJB MDD**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. STATEMENT OF RELEVANT FACTS ............................................................ 3

    A.  Gabriel Filed This Lawsuit Asserting Various Claims—Most of Which The Court Found Legally Deficient ....................................................................... 3

    B.  The Court Found the Evidentiary Record Sufficient to Require Gabriel to Post a Bond for Attorneys' Fees in 2010 ...................................................... 4

    C.  Gabriel Tries and Fails—Seven Times—To Articulate Its Alleged Trade Secrets With Particularity .............................................................................. 5

    D.  The Court Rejected Plaintiffs' Sham Affidavits and Granted Summary Judgment on the Trade Secrets and Breach of Contract Claims ..................... 7

    E.  Plaintiffs Inventorship Claim Fared No Better ............................................. 9

        1.  Plaintiffs could not identify the alleged omitted inventors for years .......... 9

        2.  Plaintiffs identified allegedly omitted inventors who then denied having contributed to the patents .......................................................... 10

        3.  Plaintiffs failed to identify any evidence to support their inventorship claims .................................................................................. 11

        4.  Plaintiffs' jettisoned the majority of the patents-at-issue, but only after Qualcomm prepared for discovery on them ..................................... 12

III. ARGUMENT ..................................................................................................... 13

    A.  The Court Should Award Defendants Attorneys' Fees under Section 285 .......... 13

        1.  Defendants are the prevailing parties and are entitled to fees under Section 285 ................................................................................................. 13

        2.  Plaintiffs' improper conduct makes this case "exceptional." ..................... 13

    B.  The Court Should Award Defendants their Attorneys' Fees under CUTSA ........ 14

        1.  Plaintiffs' claims were objectively specious ............................................... 15

        2.  Plaintiffs acted with subjective bad faith .................................................. 16

    C.  The Court Should Hold Plaintiffs and Their Counsel Jointly and Severally Liable for Defendants' Attorneys' Fees Incurred After Their Appearance .......... 17

    D.  Defendants' Requested Fees are Both Compensable and Reasonable.................. 18

        1.  Defendants are entitled to collect all their attorneys' fees—not just those associated with the trade secrets and patent claims ..................... 18

        2.  Defendants attorneys' fees are reasonable ................................................. 19

            a.  Counsel expended a reasonable number of hours ......................... 19

            b.  Counsels' billing rates are reasonable............................................ 20

            c.  The resultant lodestar is objectively reasonable............................ 20

            d.  Defendants also seek recovery of fees for computer-assisted algorithm-driven document review ................................................ 21

IV. CONCLUSION .................................................................................................. 21

Cooley LLP
Attorneys At Law
Palo Alto

i.

Defendants' Motion For
Attorneys' Fees
Case No. 08-cv-1992 AJB MDD

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alamar Biosciences, Inc. v. Difco Labs. Inc*,
  1996 U.S. Dist. Lexis 19239 (E.D. Cal. Feb. 23, 1996) ........................................... 16

*Badalementi v. Dunham's, Inc.*,
  896 F.2d 159 (Fed. Cir. 1990) ........................................................................... 13

*Banks v. Unisys Corp.*,
  228 F.3d 1357 (Fed. Cir. 2000) ......................................................................... 13

*Breed v. Hughes Aircraft*,
  253 F.3d 1173 (9th Cir. 2001) .......................................................................... 13

*Brooks Furniture Mfg. v. Dutailier Intern., Inc.*,
  393 F.3d 1378 (Fed. Cir. 2005) ......................................................................... 13

*Cambridge Prods. Ltd. v. Penn Nutrients, Inc.*,
  962 F.2d 1048 (Fed. Cir. 1992) ......................................................................... 13

*Carson v. Billing Police Dept.*,
  470 F.3d 889 (2006) ........................................................................................ 20

*Chambers v. NASCO, INC.*,
  501 U.S. 32 (1991) .......................................................................................... 17

*City of Burlington v. Dague*,
  505 US 557 (1992) ........................................................................................... 19

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*,
  479 F. 3d 1099 (9th Cir. 2007) ......................................................................... 15

*Fink v. Gomez*,
  239 F. 3d 989 (9th Cir. 2001) ........................................................................... 17

*FLIR Systems, Inc. v. Parrish*,
  174 Cal. App. 4th 1270 (2009) ..................................................................... 15, 16

*Gates v. Deukmejian*,
  987 F.2d 1392 (9th Cir. 1992) .......................................................................... 20

*Gemini Aluminum Corp. v. California Custom Shapes, Inc.*,
  95 Cal. App.4th 1249 (2002) ....................................................................... 15, 16

*Guam Soc'y of Obstetricians & Gynecologists v. Ada*,
  100 F.3d 691 (9th Cir. 1996) ............................................................................ 20

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

ii.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

# TABLE OF AUTHORITIES
## (continued)

Page

*Haynes International, Inc. v. Jessop Steel, Co.*,
    8 F.3d 1573 (Fed. Cir. 1993)..................................................................... 14

*Hensley v. Eckerhart*,
    461 US 424 (1983) .................................................................................... 19

*Hughes v. Novi American, Inc.*
    724 F.2d 122 (Fed. Cir. 1984).................................................................. 14

*Knight v. City of Capitola*,
    4 Cal. App. 4th 918 (1992) ...................................................................... 16

*MCV, Inc. v. King-Seeley Thermos Co.*,
    870 F.2d 1568 (Fed. Cir. 1989)................................................................ 13

*Molski v. Evergreen Dynasty Corp.*,
    500 F.3d 1047 (9th Cir. 2007)................................................................. 14

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*,
    267 F. Supp. 726 (S.D. Cal. 1966) .......................................................... 18

*Perdue v. Kenny A. ex rel. Winn*,
    130 S.Ct. 1662 (2010) .............................................................................. 19

*Realtek Semiconductor Corp. v. Marvell Semiconductor, Inc.*,
    2005 WL 3634617 (N.D. Cal. 2005)........................................................ 14

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752............................................................................................ 17, 18

*Standard Oil Co. v. American Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985).................................................................. 13

*Talon, Inc. v. Union Slide Fastener, Inc.*
    266 F. 2d 731 (9th Cir. 1959)................................................................... 18

*Yamanouchi Pharm. Co. Ltd. v. Danbury Pharmacal, Inc.*,
    231 F.3d 1339 (Fed. Cir. 2000)................................................................ 14

**STATUTES**

28 U.S.C. Sections 1331 ................................................................................ 13

35 U.S.C. Section 256 .................................................................................... 13

35 U.S.C. Section 285 ........................................................................ 3, 13, 18, 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    Cal. Civ. Code § 3426.4 .................................................................................... 14, 15, 18

4    Cal. Civ. Code § 1030 ................................................................................................ 4, 9

5    Cal. Civ. Code § 2019.210 ...................................................................................... 5, 6, 7

6    California Uniform Trade Secrets Act. .................................................................. 12, 15

7    **OTHER AUTHORITIES**

8    California Rule of Professional Conduct 5-310(B) ...................................................... 8

9    Fed. R. Civ. P. 11 ......................................................................................... 13, 14, 17

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iv.

**DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD**

## I.    INTRODUCTION.

On September 20, 2010, Judge Anello looked at the evidence available at the time and ordered Plaintiffs Gabriel Technologies Corporation and Trace Technologies LLC to post a bond in the amount of $800,000.  In requiring the bond, Judge Anello concluded that the Defendants, Qualcomm Incorporated, SnapTrack, Inc. and Norman Krasner, were likely to prevail on the merits of the case *and* recover attorneys' fees because this case was both exceptional under the Patent Act and brought in bad faith.  In his Order, Judge Anello stated:

- "[T]hat Gabriel has suffered a long history of corrupt officers and directors who are not above taking illegal and fraudulent actions to guarantee their own personal gain";

- That the Court was "troubled by Plaintiffs' inability to draw any meaningful connection" between its own technology and the Defendants' patented inventions; and

- That Defendants had presented "significant, unrebutted evidence that Plaintiff's lawsuit is likely unmeritorious, and brought in bad faith to salvage Gabriel."

(Order Granting in Part and Denying in Part Ds.' Mot. for Bond (hereinafter, the "Bond Order"), Dkt. 110, at 22 (emphasis added).)

Judge Anello's conclusions were spot-on—Plaintiffs' case was unmeritorious, was brought in bad faith, and is exceptional.  First, discovery has confirmed that Plaintiffs had no basis to bring this case, and certainly no basis to maintain it for four years.  They did so because the "corrupt officers and directors" had, through the efforts of a convicted felon, raised almost $6 million dollars by hawking the non-existent claims to unwitting investors with a double-your-money-back promise upon a successful conclusion of the case.  When those investors started demanding a return, Plaintiffs filed a "strongly worded" complaint seeking over $1 billion in damages, apparently hoping to frighten Defendants into a $400 million "lay-down settlement."  Plaintiffs' strategy backfired.  When Qualcomm fought the extortionate demands, Plaintiffs had to try to support the allegations with documents and witness testimony.  Those efforts exposed what Plaintiffs already knew—"*we have no case.  Just a lot of talk.*"  Despite seven tries, Plaintiffs were never able to articulate even a single protectable trade secret and, as this Court recently recognized, Plaintiffs were equally unable to identify *any* evidence supporting their supposed contributions to Qualcomm's patents.  In the end, the Court found that Plaintiffs had not

even raised a triable issue of fact on its claims and granted summary judgment in favor of Defendants.[1]

Not only did Plaintiffs lack any basis to assert their claims, but the manner in which they pursued them was outrageous.  Plaintiffs' improper conduct included:

- With the help of another convicted felon, Gabriel crafted a three-act "play"—unsupported by facts—to lure additional investors to fund the case;

- Gabriel opposed Qualcomm's motion to require the out-of-state plaintiff to post a cost bond by representing to the Court that it had, conveniently on the eve of the hearing, moved its corporate headquarters from Omaha, Nebraska to a residential apartment in San Francisco, the lease for which prohibits commercial use of the premises;

- Without permission, Gabriel filed a fifth amended complaint that included a claim, for fraud, that the Court had previously dismissed *with prejudice*;

- Gabriel's CEO, with the knowledge of Gabriel's litigation counsel, granted a percipient witness a contingent financial interests in the outcome of this case in violation of the California Rules of Professional Conduct;

- Gabriel attempted to submit an *amicus curiae* brief that the Court found to be "biased" and unreliable;

- In a futile attempt to avoid summary judgment on its trade secrets claim, Gabriel submitted three sham affidavits that directly contradicted the sworn deposition testimony of its witnesses;

- Gabriel served verified interrogatory responses—prepared without even the most basic investigation—that were incomplete, incorrect or both;  and

- Gabriel alleged that Qualcomm had stolen "at least ninety-two" U.S. and foreign patents, but after forcing Qualcomm to expend substantial time and effort to collect documents and prepare a defense, simply abandoned all but six.

Just as Judge Anello predicted more than two years ago, Plaintiffs' misconduct warrants a finding that they brought this case in bad faith and that it is "exceptional" under the Patent Act.

While Defendants have systematically dismantled the Plaintiffs' claims and exposed them for what they were—a pure fiction designed to extort money from Defendants—it is unfair to saddle Defendants with the cost of doing so.  Defendants have incurred in excess of $10 million

---

[1] The evidence supporting the facts in this introduction have previously been submitted to the Court in the Declaration of Jeffrey S. Karr in support of the first summary judgment motion (Dkt. 188-3 filed September 27, 2011) and in the Declaration of Timothy S. Teter in support of the second summary judgment motion (Dkt. 296-1 filed August 10, 2012).  Those declarations will be referred to herein as the "Karr SJ Dec." and the "Teter SJ Decl."  The evidence supporting the facts in the introduction are found in the Karr SJ Decl., Exs. 24 ("strongly worded complaint"), 25 at 1 ("lay-down settlement"), and 29 at 2 ("we have no case.  Just a lot of talk.").

COOLEY LLP
ATTORNEYS AT LAW

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

defending this action.  Under both 35 U.S.C. Section 285 and the California Uniform Trade Secret Act, the Court should award Defendants the fees they reasonably incurred in defending themselves for four years against Plaintiffs' "billion" dollar claim.  Because Plaintiffs' counsel, Hughes, Hubbard & Reed and Wang Hartmann Gibbs & Cauley, are at least as culpable for this misconduct, the Court should hold them jointly and severally liable for fees incurred after their appearance.

## II.    STATEMENT OF RELEVANT FACTS.

### A.    Gabriel Filed This Lawsuit Asserting Various Claims—Most of Which The Court Found Legally Deficient.

Beginning in 2006, with the help of a consultant and convicted felon named Nicholas Fegen, Gabriel began selling promissory notes to investors.  (Teter SJ Decl., Ex. 7).  Gabriel guaranteed each investor a 100% return on the investment *and* granted the holder a percentage interest in any "IP Event," which is simply another name for any settlement or judgment in this case.  (Teter SJ Decl., Ex. 35.).  When those investors became impatient, Gabriel filed a scattershot complaint on October 24, 2008 against Qualcomm, SnapTrack, and Dr. Krasner, full of sound and fury but utterly lacking in substance.  (Dkt. 1).  Gabriel's complaint asserted eleven causes of action and accused Qualcomm, Dr. Krasner, and SnapTrack of being "technology thieves" with "sinister intentions" who engaged in "clandestine activities" including a "practice of 'ghost writing' patents" with Locate technology.  (Dkt. 1 (passim).).  According to Gabriel, Qualcomm and its "chief thief" stole the ideas of Gabriel's predecessor (Locate Networks) and incorporated those ideas into "at least ninety-two" U.S. and foreign patents and patent applications.  (Dkt. 1, ¶ 58).

Over the next year and a half, Qualcomm attacked most of Gabriel's causes of action as legally defective.  (Dkt. 22, 41).  The Court agreed and dismissed with prejudice the claims for breach of the 1999 License Agreement, fraud, tortious interference, "equitable patent infringement," conversion, unjust enrichment, and unfair competition.  (Dkt. 35, 48).  The only claims to survive were the claim for breach of the 2006 License Agreement, the misappropriation of trade secrets claim, the correction of inventorship claim, and the declaration of patent

ownership claim. Although the Court had granted Defendants motion to dismiss the fraud claim *with prejudice*, on April 19, 2010, Gabriel filed—without permission—a Fifth Amended Complaint re-alleging the claim for fraud. (Dkt. 65). On April 23, 2010, the Court struck the Fifth Amended Complaint, a decision that Gabriel did not accept without another fight. (Dkt. 71 (Order striking Fifth Amended Complaint); Dkt. 72 (Gabriel's motion for reconsideration of Order striking Fifth Amended Complaint)). As a result of this motion practice, the Court disposed of seven of Gabriel's eleven claims on the pleadings.

**B.      The Court Found the Evidentiary Record Sufficient to Require Gabriel to Post a Bond for Attorneys' Fees in 2010.**

On July 2, 2010, Defendants filed a motion to require Gabriel, an out-of-state plaintiff, to post a bond pursuant to California Civil Procedure Code Section 1030. (Dkt. 81). The motion relied on a series of candid e-mails between one of Gabriel's Board Members, John Hall, Gabriel's former CFO, Maurice Shanley, and Gabriel's former CTO, Allan Angus. The e-mails, which were written when Gabriel was desperate for additional financing and new lawyers, included such damaging admissions as:

- In summary, we are looking for financing, a new law firm, but with what. The cu[p]board is bare. *The case [h]as never been developed beyond filling a complaint over something that happened 10 years ago.* There is no package with the 20 most important documents and the narrative that supports the case. It doesn't exist.

- We have been turned down everywhere we go. *Why would anyone invest a dime.* Not even Guido will give us money and why would he.

- There are only a few full contingency firms that can afford to take on a case of this size and complexity. *They won't touch this case because we have no case. Just a lot of talk*".

(Teter SJ Decl., Ex. 9). The e-mails further accused Gabriel's management of using the litigation as a way to raise money and then "feed at the trough," all while leaving Gabriel with nothing but "servers and some paper." (Karr SJ Decl., Ex. 25 ("fed at the trough"); Teter SJ Decl., Ex. 11). Of course, Angus believed "the real value was never there anyway." (Teter SJ Decl., Ex. 11). Instead, Angus thought "[t]he real value is always going to be in the fight, how to respond to an opposing attorney's questions, how to make the case." (Teter SJ Decl., Ex. 11).

After obtaining a two week extension to file its opposition to the Bond motion, Gabriel barely disputed the contents of the e-mails, attempting to dismiss them as the grumblings of a

disgruntled former employee.  Instead, Gabriel argued that the Court could not order the bond because Gabriel was no longer an out-of-state plaintiff, having just relocated its headquarters to an address in San Francisco, California.  (Dkt. 93, at 8).  But, as Qualcomm revealed to the Court, the address was a residential apartment building with lease terms that expressly prohibited the use of the premises for commercial purposes.  Caught in a deception, Gabriel had no credible response and the Court did not bite.  (Bond Order, at 6-7).

On September 20, 2010, the Court ordered Plaintiffs to post an $800,000 bond to cover Defendants' anticipated costs and a portion of their attorneys' fees.  The Court wrote:

> Defendants have presented significant, unrebutted evidence that Plaintiffs' lawsuit is likely unmeritorious, and brought in bad faith to salvage Gabriel.  The Court will not go through each individual email correspondence here, but will note that when read as a whole, the Court is convinced they create a logical inference that Gabriel has suffered a long history of corrupt officers and directors who are not above taking illegal and fraudulent actions to guarantee their own personal gain. Plaintiffs asserted the emails are nothing more than a disgruntled employees' expressions of frustration with Gabriel's management, and have no bearing on the merits of the case.  The Court disagrees.  Although the emails indicate their authors are upset by how Gabriel has treated them, and alone, they do not conclusively establish this action is without merit, the Court finds that when the emails are considered in connection with Defendants' evidence demonstrating a reasonable possibility of success on the merits, there is a strong likelihood Defendants will ultimately prove this case is exceptional, and attorneys' fees will be warranted at the conclusion of the litigation.

(Bond Order, 22:1-14 (footnote omitted).)  With respect to the inventorship claims, the Court further stated that it was:

> troubled by Plaintiffs' inability to draw any meaningful connection between Locate's technology and the allegedly misappropriated information found in more than 92 patents. The parties began working together approximately a decade ago, Plaintiffs assert they suspected wrongdoing in approximately 2007, and they have been investigating their claims for several years.  By now, Plaintiffs should have more than mere allegations to support their theory.  Thus, the $1 million in attorneys' fees Defendants have incurred to date may be reasonably included in the Court's determination of an appropriate bond amount.

(Bond Order, at 22:16-22.).  Judge Anello's finding would prove prophetic.

### C. Gabriel Tries and Fails—Seven Times—To Articulate Its Alleged Trade Secrets With Particularity.

On March 30, 2010, Magistrate Judge Porter ordered Gabriel, pursuant to California Civil Procedure Code Section 2019.210, to "identify any alleged trade secrets with reasonable particularity on or before May 1, 2010."  (Dkt. 61, ¶ 4).  Between May and December 2010,

Gabriel served five different purported trade secret designations. Defendants disputed the adequacy of each, leading Gabriel to file a motion to compel Defendants to respond to trade secrets discovery. (Dkt. 128). The Court disagreed that Gabriel had adequately identified any protectable trade secrets and ordered Gabriel to try again. (Dkt. 145).

Armed with a new trade secret designation, the parties engaged in two subsequent discovery conferences with Magistrate Judge Dembin. (*See* Dkt. 160 & 165.) During the first, the parties agreed to engage in limited discovery into the "genesis" of "up to two of Defendants' patents identified in the Fourth Amended Complaint which are claimed to be based, in whole or in part, upon Plaintiff's trade secrets." (Dkt. 160, at 1:28-2:3.) The purpose of the discovery was to assist Gabriel in identifying its purported trade secrets—a generous gift given the basic notion that a plaintiff is expected to know what its trade secrets are without having to "discover" them from someone else.

As permitted, Gabriel identified one patent, the '277 patent, and sought broad ranging discovery from Defendants. But Gabriel did not limit the discovery it sought from Defendants as contemplated. So Judge Dembin convened a second hearing because of a "disagreement regarding the scope of permissible discovery pursuant to" that agreement. (Dkt. 165, at 1). Judge Dembin denied Plaintiffs the discovery they sought (Dkt. 165, at 1-2), later commenting that "the Court agreed [with Defendants that] Plaintiffs were seeking *far broader discovery* than contemplated by the brokered agreement." (Dkt. 229, at 8:9-10.)

But even with the benefit of discovery—which Section 2019.210 ordinarily prohibits in these circumstances—Plaintiffs still could not identify any trade secrets to support its allegations of misappropriation. In early September, Plaintiffs served yet another trade secret designation and filed a second motion to compel, arguing that their *seventh* attempt to articulate their trade secrets was adequate. (Dkt. 170). Magistrate Dembin concluded that Plaintiff's last and best attempt at identifying a trade secret suffered from "intolerable vagueness" (Dkt. 229 at 8:23), and re-affirmed his earlier finding that the rest of Plaintiff's purported secrets "contain even less information and more ambiguous terms." (Dkt. 229 at 9:15-16).

With its trade secrets claim dead in the water, Plaintiffs objected to Magistrate Dembin's

ruling.  (*See* Dkt. 251, 1:17-18 (moving to seal objections).)  In conjunction with the objection, Plaintiffs filed an *ex parte* motion for leave to file an *amicus curiae* brief by Roger Milgrim, the author of a widely-circulated text on trade secrets law, that argued that Plaintiffs should not be required to comply with Section 2019.210 at all.  (Dkt. 234)  Oddly, Mr. Milgrim's *amicus* brief took a position that was diametrically opposed to the opinion he offered in his own text, and failed to mention—let alone distinguish—the authority upon which the Court had relied for its rulings.  On March 13, 2012, the Court refused to consider the *amicus* brief, stating that:

> Mr. Milgrim does not add a unique perspective or knowledge on this issue and his opinion appears to be at odds with that set forth previously by him in his text, Milgrim on Trade Secrets.  The Court finds Mr. Milgrim's reference to cases and analysis are generally biased and do not rise above the capabilities of Plaintiff's counsel.

(Dkt. 251, at 7:27-8:3.)

In that same Order, the Court upheld Magistrate Dembin's ruling that the trade secrets designation was insufficient.  (Dkt. 251, at 8:10-11.)  Thus, eighteen months after this Court said it was "troubled by Plaintiffs' inability to draw any meaningful connection between Locate's technology and the allegedly misappropriated information found in more than 92 patents," the Court found that Plaintiffs had still failed to do so.  (Bond Order, at 22:16-18.)  In sum, despite seven tries, Plaintiffs have never been able to identify even a single protectable trade secret.

### D. The Court Rejected Plaintiffs' Sham Affidavits and Granted Summary Judgment on the Trade Secrets and Breach of Contract Claims.

While the parties were disputing the sufficiency of Plaintiffs' alleged trade secret designation, Defendants filed a motion for summary judgment on Plaintiffs' breach of contract claim and trade secrets claim.  (Dkt. 188)  The motion asserted that the trade secrets claim and the contract claim were time barred and that Plaintiffs cannot assert a breach of contract claim because it failed to comply with its own contractual obligations.

With respect to the statute of limitations arguments, during discovery, Defendants had obtained deposition testimony from William Clise, Locate's Chief Technology Officer, that he believed as early as January 2003 that Qualcomm had "directly ripped off" Locate's technology.  Nevertheless, Clise admitted that he did nothing about it.  When asked why, Clise testified:

1   I don't know.  I'm a bad businessman.  What's the answer? I don't know.  I didn't
2   think it was important.  We were—our focus was trying to get our product to
    market and build a service.  I just—this was not something that was in our radar
    right then.

3   (Teter SJ Decl. Ex. 7, Clise Dep. 37:14-20.).   In addition, Gabriel's former CFO, Maurice

4   Shanley, testified that Gabriel engaged counsel in September 2004 to investigate the very claims

5   that Gabriel asserted in this case.  (Karr SJ Decl., Ex. 33 (Shanley Dep. 103:10-104:6)).  With

6   such smoking gun admissions, Gabriel's trade secrets claim was doomed.

7        Plaintiffs then pulled out all of the stops in an effort to save the cause of action.  First,

8   Gabriel relied on the sworn affidavit of a witness to whom it had granted a contingent interest in

9   the outcome of this case.  This affidavit violated California Rule of Professional Conduct 5-

10  310(B).  (*See* Ds.' Reply Brief in Support of Mot. for Partial Summary Judgment, Dkt. 221, at 1-3

11  (implicating testimony of Allan Angus and Moe Shanley).)

12       Even worse, Gabriel submitted three affidavits from William Clise, Allan Angus, and Moe

13  Shanley that directly contradicted prior deposition testimony.  In excluding the affidavits, the

14  Court wrote:

15  •  The Court finds that the affidavit submitted by Clise directly and inexplicably contradicts
16     his prior sworn testimony warranting its exclusion under the sham affidavit rule.  (Trade
       Secrets MSJ Order, Dkt. 252, at 11:12-13 (footnote omitted).)

17  •  Given the unsupported and contradictory nature of Shanley's affidavit and his contingent
18     interest in the outcome of this litigation, the Court finds his affidavit appropriate for
       exclusion pursuant to the sham affidavit rule.  (*Id*. at 14:6-8 (footnote omitted).)

19  •  The Court finds that Angus lacks personal knowledge to testify as to what these
20     documents mean or what inferences the Court should draw from them and the
       questionable nature of his affidavit is further compounded by the contradictory nature of
21     his testimony and the contingent interest he holds in the outcome of this litigation. As
       such, the Court finds Angus' affidavit warrants exclusion pursuant to the sham affidavit
22     rule.  (*Id*. at 14:11-15:2 (footnote omitted).)

23  Despite its resort to improper and sham evidence, Plaintiffs still could not avoid the inevitable.

24       On March 13, 2012, the Court issued a separate order granting the summary judgment

25  motion as to the trade secrets claim and as to the majority of the breach of contract claim.  (Doc.

26  No. 252.)  Like with the trade secrets designation issue, the Court relied on the very arguments

27  that Judge Anello had identified two years earlier.  (*Compare* Bond Order at 15:24-27 ("it appears

28

that Plaintiffs had reason to suspect" misappropriation prior to the critical date for the statute of limitations) with Trade Secrets MSJ Order at 15:3-7 ("the Court finds . . . there is no dispute of material fact that Plaintiffs became suspicious of misappropriation . . . well before December 17, 2004").)[2]

### E. Plaintiffs Inventorship Claim Fared No Better.

#### 1. Plaintiffs could not identify the alleged omitted inventors for years.

As soon as discovery began, Defendants asked Plaintiffs to identify each allegedly omitted inventor and their alleged inventive contribution for each patent at issue. This was really the heart of Plaintiffs' purported case regardless of the cause of action—the notion that they conceived of ideas that Qualcomm put into its patents without attribution. (Teter SJ Decl., Ex. 15 at 3). As far back as the Motion for Bond, Defendants complained that Plaintiffs refused to identify their alleged inventors and inventions. (Memo of Points and Authorities In Support of Ds.' Mot. for a Bond Pursuant to C.C.P. § 1030, Dkt. 81-1, 1:21-23 ("Indeed, Gabriel refuses to provide basic facts regarding alleged inventive contributions to the patents-at-issue by anyone other than the named inventors because it is 'premature' for Defendants to seek such information.") It is no wonder Plaintiffs resisted providing this basic information—they had no basis to identify anyone or anything. It was all a sham.

Indeed, Plaintiffs were unable to decide who to name as omitted inventors for years. For the '277 and '639 patents, Gabriel's first interrogatory responses, served in May 2010—more than eighteen months into the case—stated that the omitted inventor was "under investigation." (Teter SJ Decl. Ex. 15 at 5.) Plaintiffs should not have asserted a claim to correct inventorship on these patents if it did not know who else contributed to the patents after eighteen months of litigation. Indeed, Plaintiffs' failure to identify anyone is even more egregious because, ultimately, Gabriel identified William Clise as an omitted inventor. But Clise was the very person who verified the truth of the prior responses. If Clise was really an omitted inventor, he should not have verified responses that failed to identify him as such. When asked about this

---

[2] The Court similarly confirmed its ruling from the Bond Order that Plaintiffs' failure to identify any "Program Technology," along with the statute of limitations, doomed most of their contract claim. (Trade Secrets MSJ Order at 16:1-20:15 (citing Bond Order at 12).)

omission, Clise testified:

> I don't know really where my mind was at that point. You know, I don't know if
> we had or hadn't or whether there was more things that needed to be looked at or –
> I don't know why it says "under investigation." I don't know why that's what it
> says, but it appears that I did not put my name down as being a contributing
> inventor at that time or omitted inventor.

(Teter SJ Decl. Ex. 7, Clise Tr. 49:1-12).

For other patents where Plaintiffs did identify an omitted inventor, those names *changed* repeatedly. For example, Gabriel first identified Aaron Grant, who started at Locate in 2000, as the omitted inventor for the '958 patent, for which Defendants had completed an application in October 1999. (Teter SJ Decl., Ex. 15, at 5). Later, Gabriel changed its mind, adding Clise and Crowson as omitted inventors. (Teter SJ Decl., Ex. 33 at 5; s*ee also* Amended Patents MSJ Order, Dkt. 328, at 10:17-11:20 (switching '249 patent from "at least William Clise" to Clise, Green, and Phil DeCarlo); 11:22-13:2 (indentifying "at least" Clise, Crowson, and Grant in response to '195 patent).) If there was ever a doubt, this case for Gabriel clearly was not about asserting legitimate rights, but about trying to make up a story that might stick. But, the facts kept getting in the way of Gabriel's strategy.

### 2. Plaintiffs identified allegedly omitted inventors who then denied having contributed to the patents.

Not only did Gabriel change its mind repeatedly on who to name as omitted inventors in sworn interrogatory responses, but Plaintiffs served responses without any connection to the truth. A perfect example of Plaintiffs' misconduct is the '050 patent. As the Court stated:

> The '050 patent issued on September 28, 2004, and named Qualcomm's Dr.
> Krasner as sole inventor. In 2010, Plaintiffs failed to identify an alleged "omitted
> inventor" for this patent in their original interrogatory responses. Plaintiffs
> amended the responses to declare that Philip DeCarlo, a Locate employee, "and
> one or more engineers employed by Glenayre" were the inventors of the '050
> patent. However, DeCarlo testified that he did not invent the '050 patent, never
> told anyone he should be a named inventor, and did not know why he was listed
> as an omitted inventor.[3] On May 14, 2012, Plaintiffs revised their interrogatories
> again to declare that Clise was the sole inventor of the '050 patent.

---

[3] DeCarlo was a paid "litigation consultant" for Plaintiffs, and they had every opportunity to verify with him the alleged inventive contributions they were ascribing to him in sworn discovery responses.

COOLEY LLP
ATTORNEYS AT LAW

10.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

(Dkt. 328, at 7:4-11 (record citations omitted); *see also* Patents MSJ, Dkt. 323, 15:9-16:14).

But the '050 patent is not the only such example. In the interrogatory responses served on June 22, 2010, Gabriel identified William Clise as the omitted inventor on the '402 patent. (Teter SJ Decl., Ex. 16, at 4). The responses identified his contribution as "incorporating code phase measurements added to acquisition assistance section for support of coherent integration across one or more GPS bits and implementation of code phase into acquisition assistance message." (Teter SJ Decl., Ex. 16, at 4). When asked if he invented that contribution, Clise simply said "no." (Declaration of Jeffrey S. Karr in Support of Motion for Attorneys' Fees ("Karr Decl."), filed concurrently herewith, Ex. A, Clise Dep. Transcript, 769:16-770:1). Indeed, Clise could not answer any other way, because when asked what that contribution meant, Clise said "I would have to have an engineer explain it to me and then I could tell you what it meant." (*Id.* at 769:2-8). Clise could not have invented something that he does not even understand, a fact that both Gabriel and its counsel must surely have known at the time they served the verified interrogatory responses.

### 3. Plaintiffs failed to identify any evidence to support their inventorship claims.

As the Court recognized in granting Defendants' second summary judgment motion, Plaintiffs were unable to identify any evidence to support their inventorship claims.

- For the '050 patent, the Court noted that "Clise admitted that he did not even think of certain technologies that the '050 patent addresses" and that he "had no answer when asked to identify specific information that he provided to Dr. Krasner that could qualify Clise as the true inventor." (Patents MSJ Order, Dkt. 328, at 7).

- For the '958 patent, the Court found that Clise "could not say 'with any reliability who did what when'" and that "Plaintiffs have no evidence that they conveyed their ideas to Dr. Krasner and Sheynblat before SnapTrack's invention in October 1999." (Patents MSJ Order, Dkt. 328, at 8).

- With respect to the '277 and '639 patents, the Court noted that "Plaintiffs have no evidence that anyone at Locate conceived of the '277/'639 invention" because "the Locate system was very different from the '277 patent because the UE did not store nor send a position estimate." (Patents SJ Order, Dkt. 328, at 9). In addition, the Court noted that "Plaintiffs have no evidence that the named inventors . . . took information from Locate" because all of the allegedly omitted inventors "testified that they had never met Burroughs, Edge or Fisher." (Patents SJ Order, Dkt. 328, at 10).

COOLEY LLP
ATTORNEYS AT LAW

11.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

- For the '249 patent, the Court recognized that Clise did not even understand the patent, dismissing it as "a lot of technical jargon." (Patents SJ Order, Dkt. 328, at 11). Moreover, the Court found that Plaintiffs had no evidence to support their allegation that Dr. Gaal received any information from Clise. (Patents SJ Order, Dkt. 328, at 11).

- Finally, with respect to the '195 patent, the Court found that Plaintiffs' alleged contributions were all in the prior art, and that "Plaintiffs have no evidence to back up the allegation that Dr. Krasner, Dr. Wolf, and Sheynblat wrote the '195 patent using information from Clise and Crowson." (Patent SJ Order, Dkt. 328, at 12).

As the Court's findings demonstrate, even after extensive discovery, Plaintiffs had no basis to allege that Defendants "stole" any ideas from Locate.

But this fact is not surprising because it appears that Plaintiffs were simply making this case up as they went along. The evidence is that in early 2010, as Gabriel was out of money, out of lawyers, and "[had] no case" "just a lot of talk," Angus, Clise and Crowson got together and prepared an "evidence binder" to present to potential investors and counsel. (Teter SJ Decl. Ex. 22). In an e-mail about the binder, Angus described the case as a three act "play." (Teter SJ Decl. Ex. 22).

### 4. Plaintiffs' jettisoned the majority of the patents-at-issue, but only after Qualcomm prepared for discovery on them.

After the Court granted summary judgment on the trade secrets claim, the parties prepared for discovery on the inventorship claims. At that time, Gabriel had alleged that Defendants incorporated Locate's ideas into "at least ninety-two" U.S. and Foreign patents. (Dkt. 1, ¶ 58). Given the claims, Defendants had prepared to defend the allegations. Defendants' preparation included conducting interviews of all of the inventors on the patents and collecting documents relating to each one. In total, Qualcomm collected in excess of 12 million documents for this case. (Karr Decl., ¶ 11). Probably concerned that its witnesses could never study up on that many patents to testify credibly about them as alleged inventors, Gabriel simply abandoned most of the patents and pursued only the most elementary six patents. As demonstrated below, the totality of the circumstances in this case warrant an award of attorneys' fees in favor of Qualcomm both under the Patent Act and the California Uniform Trade Secrets Act.

### III.   ARGUMENT.

####   A.   The Court Should Award Defendants Attorneys' Fees under Section 285.

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  The purpose of the exceptional case rule is to protect litigants who would otherwise be forced to bear their own attorneys' fees in instances of meritless patent litigation.  *Badalementi v. Dunham's, Inc.*, 896 F.2d 159, 1364 (Fed. Cir. 1990).  It is hard to conceive of a more appropriate case for an award of attorneys' fees under Section 285.

####   1.   Defendants are the prevailing parties and are entitled to fees under Section 285.

Defendants are eligible for attorneys' fees under Section 285.  First, this case, which includes a claim for correction of inventorship under 35 U.S.C. Section 256, arises under the patent laws and implicates Section 285—a fact admitted by the Plaintiffs.  *See* Plaintiffs' Original Complaint, Dkt. 1, ¶ 10 and Prayer for Relief (asserting 28 U.S.C. Sections 1331 (federal question) and 1338 (patents) as basis for jurisdiction and requesting attorneys' fees); *see also Breed v. Hughes Aircraft*, 253 F.3d 1173, 1177 (9th Cir. 2001) (citing *Banks v. Unisys Corp.,* 228 F.3d 1357, 1359 (Fed. Cir. 2000); *MCV, Inc. v. King-Seeley Thermos Co.,* 870 F.2d 1568, 1570 (Fed. Cir. 1989) ("The Federal Circuit itself has stated quite plainly that claims based on 35 U.S.C. § 256 . . . arise under the patent laws").  Second, Defendants are the prevailing parties in this litigation.  Plaintiffs asserted eleven causes of action.  The Court entered judgment in Defendants' favor on each and every claim.

####   2.   Plaintiffs' improper conduct makes this case "exceptional."

"A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions."  *Brooks Furniture Mfg. v. Dutailier Intern., Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (citing *Cambridge Prods. Ltd. v. Penn Nutrients, Inc.,* 962 F.2d 1048, 1050-51 (Fed. Cir. 1992).  The Federal Circuit has recognized that a "frivolous" case can be "exceptional."  *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d

COOLEY LLP
ATTORNEYS AT LAW

13.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

448, 455 (Fed. Cir. 1985). A "frivolous" case "is one which the patentee knew or, on reasonable investigation, should have known, was baseless." *Haynes International, Inc. v. Jessop Steel, Co.,* 8 F.3d 1573, 1579 (Fed. Cir. 1993), *on rehearing,* 15 F.3d 1076 (Fed. Cir. 1994); *see also Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047, 1060-61 (9th Cir. 2007) (interpreting "frivolous" to means claims that are patently without merit, make false or grossly exaggerated factual assertions, or contain patently absurd or irrelevant allegations); *Hughes v. Novi American, Inc.* 724 F.2d 122, 126 (Fed. Cir. 1984) (holding patent owner and assignee liable for attorneys' fees when they continued suit despite clear evidence of public use bar and noninfringment, and concluding that attorneys' fees may be warranted even absent bad faith filing of suit). In addition, failure to comply with discovery obligations can warrant an exceptional case finding. *See Realtek Semiconductor Corp. v. Marvell Semiconductor, Inc.*, 2005 WL 3634617, at *6-7 (N.D. Cal. 2005); Fed. R. Civ. Proc. 11. In deciding whether a case is exceptional, a court must consider the totality of the circumstances. *Yamanouchi Pharm. Co. Ltd. v. Danbury Pharmacal, Inc.,* 231 F.3d 1339, 1347 (Fed. Cir. 2000).

This case is full of instances of "unjustified litigation," "misconduct during litigation," and "conduct that violates" Rule 11. Such conduct, discussed in more detail above, includes: (1) filing of sham affidavits in an attempt to avoid an obvious summary judgment motion; (2) serving incomplete and inaccurate verified interrogatory responses without even the most basic investigation—like asking its litigation consultants whether they actually invented the ideas attributed to them; (3) granting a contingent interest to a percipient witness in violation of the California Rules of Professional Conduct; (4) submitting a "biased" *amicus* brief; (5) pursuing inventorship claims that had no evidentiary support—or truth to them—whatsoever; and (6) simply making up a patent inventorship "play" to dupe unwitting investors. Just as Judge Anello suspected, Plaintiffs' conduct warrants a finding that this case is "exceptional."

### B. The Court Should Award Defendants their Attorneys' Fees under CUTSA.

If a claim of misappropriation is made in bad faith, the court may award reasonable attorney's fees to the prevailing party. Cal. Civ. Code § 3426.4.[4] "An award of attorney fees for

---

[4] Federal Courts may award attorney's fees to successful litigants under this provision of

COOLEY LLP
ATTORNEYS AT LAW

14.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

bad faith constitutes a sanction, and the trial court has broad discretion in ruling on sanctions motions." *Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal. App.4th 1249, 1262 (2002). "The California Court of Appeal has interpreted the statute's 'bad faith' element to require 'objective speciousness of the plaintiff's claim . . . and its subjective bad faith in bringing or maintaining the claim.'" *CRST Van Expedited, Inc.*, 479 F. 3d at 1111 (quoting *Gemini Aluminum*, 95 Cal. App. 4th at 1262). Here, the Court should award Defendants the fees incurred prior to March 13, 2012 (the date of the summary judgment order disposing of the trade secrets claim) pursuant to the California Uniform Trade Secrets Act.[5]

### 1. Plaintiffs' claims were objectively specious.

To sanction Plaintiffs under CUTSA, the Court must first find that their claims were objectively specious. "Objective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim." *FLIR Systems, Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1276 (2009) (*citing Gemini Aluminum*, 95 Cal.App.4th at 1261; *CRST Van Expedited*, 479 F.3d 1099 at 1112).

Here, Plaintiffs' claims were objectively specious. First, *despite seven tries*, Plaintiffs were never able to articulate even a single protectable trade secret. Second, as the Court found in the patent summary judgment motion, Plaintiffs were unable to present any evidence that Defendants received Plaintiffs trade secrets or incorporated them into their patent filings.[6] Third, despite clear evidence and the admissions of its own witnesses that Gabriel suspected Qualcomm of misappropriation as early as January 2003, Plaintiffs refused to concede that its trade secrets claim was barred by the statute of limitations. Maintaining its claim in the face of this evidence

---

California law. *See CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F. 3d 1099, 1111 (9th Cir. 2007) (concluding that "§ 3426.4 properly was applied by the district court under the rule of *Erie v. Tompkins*).

[5] To the extent the Court awards fees under CUTSA, but not under the Patent Act, the amounts sought are $7,479,843.70 from Gabriel, for which $5,514,684.70 counsel should be held responsible. (Karr Decl., ¶ 7).

[6] Plaintiffs' trade secret claim overlaps completely with its inventorship claim and contract claims. (*See* Defendants' Supplemental Brief re Contract Remedies, Dkt. 274, at pp. 4-7 (explaining complete overlap with citations to Plaintiffs' discovery responses). In other words, Plaintiffs' alleged trade secrets are its alleged inventive contributions to the patents. Accordingly, the Court's finding that Plaintiffs had no support for their inventorship claim is equally applicable to the trade secrets claim.

COOLEY LLP
ATTORNEYS AT LAW

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

was objectively specious.

### 2. Plaintiffs acted with subjective bad faith.

The second element after objective speciousness is subjective bad faith, which "may be inferred by evidence that appellants intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive." *Id.* at 1278 (*citing Gemini Aluminum*, 95 Cal.App.4th at 1263). "A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence." *Gemini Aluminum*, 95 Cal. App. 4th at 1263 (*quoting Knight v. City of Capitola*, 4 Cal. App. 4th 918, 932 (1992).) "**Bad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised.**" *Gemini Aluminum*, 95 Cal. App. 4th at 1264 (emphasis added) (quoting *Alamar Biosciences, Inc. v. Difco Labs. Inc*, 1996 U.S. Dist. Lexis 19239, *3 (E.D. Cal. Feb. 23, 1996)); *see also FLIR Systems,* 174 Cal. App. 4th at 1278 (citing with approval this test from *Gemini Aluminum*).

Judge Anello's initial conclusion that Plaintiffs pursued the trade secrets claim in bad faith was fully confirmed by later developments in the case. First, Defendants' successful motions for summary judgment on the very grounds emphasized in the Bond Order are the epitome of a case where a litigant decided "to go forward despite the inability to respond to the arguments raised" previously by both Defendants and the Court. More to the point, Plaintiffs' decision to attempt to refute the statute of limitations argument with three sham affidavits warrants an inference of bad faith.

Second, despite substantial discovery, Plaintiffs still have no evidence to refute the inference raised at the time of the Bond Hearing that Plaintiffs pursued this lawsuit to defraud investors, and that Plaintiffs harbored an improper, extortionate motive in filing and then pursuing their meritless claims.

Finally, the long litany of incidents of litigation misconduct—including "sham affidavits," ethics violations, a "biased" *amicus curiae*, seven "intolerably vague" trade secrets designations, over-reaching discovery, and an ever-changing list of allegedly omitted inventors is ample

grounds for the Court to infer Plaintiffs' bad-faith.

### C. The Court Should Hold Plaintiffs and Their Counsel Jointly and Severally Liable for Defendants' Attorneys' Fees Incurred After Their Appearance.

The Court has the power to hold counsel liable for attorneys' fees when litigants act in bad faith:

> The power of a court over members of its bar is at least as great as its authority over litigants. *If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes.*

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (citations omitted) (emphasis added). The Court's power to sanction bad-faith conduct is not diminished where that conduct could also be sanctioned under a statute or the Federal Rules of Civil Procedure. *Chambers v. NASCO, INC.*, 501 U.S. 32, 50 (1991). In *Chambers*:

> the District Court could have employed Rule 11 to sanction Chambers for filing "false and frivolous pleadings," and that some of the other conduct might have been reached through other Rules. Much of the bad-faith conduct by Chambers, however, was beyond the reach of the Rules; his entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address. In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves.

*Id.* at 51 (citations omitted). "Under both *Roadway* and *Chambers,* then, the district court has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct"—including sanctions against counsel. *Fink v. Gomez*, 239 F. 3d 989, 991-92 (9th Cir. 2001).

As demonstrated above, Plaintiffs and their counsel together engaged in a pattern of conduct that was an abuse of the litigation process throughout the litigation process. And it was counsel that had responsibility for submitting the sham affidavits in opposition to Defendants' first summary judgment motion, submitting an affidavit from a witness with a known contingent interest in the outcome of the case, re-filing a claim that had already been dismissed *with prejudice* without permission, submitting a "biased" and unreliable *amicus* brief, serving verified

COOLEY LLP
ATTORNEYS AT LAW

17.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

interrogatory responses that had no basis in fact and without even the most basic investigation possible—a discussion with retained litigation consultants, and finally pursuing claims that they knew or should have known had no evidentiary support.

Because Hughes, Hubbard & Reed and Wang Hartmann, Gibbs & Cauley "willfully abused the judicial process" from the time they entered this case, the Court should find them jointly and severally liable for the attorney's fees that Defendants incurred after their appearance. *Roadway Express*, 447 U.S. at 766.  Such a finding is especially appropriate here where any sanction in excess of the Bond amount that does not reach counsel is no sanction at all.  The Court acknowledged in its Bond Order that Plaintiffs were insolvent, reducing the bond amount accordingly.  (23:16-28.)  As Defendants predicted in their opening brief on that proceeding, "In the end, Qualcomm will spend millions to knock down every claim and, when it looks to recover fees and costs under patent or trade secret law Gabriel will pull out its empty pockets and disappear."  (1:26-28.)  The $800,000 bonded up for Defendants' fees will not be adequate as either a sanction on the empty-pocketed Plaintiffs or as compensation to Defendants for their substantial outlay in defending this baseless and vexatious lawsuit.  The *only* way to effectuate the intent of 35 U.S.C. § 285 and CUTSA's § 3426.4 is to hold Plaintiffs' counsel jointly liable .

### D.    Defendants' Requested Fees are Both Compensable and Reasonable.

#### 1.    Defendants are entitled to collect all their attorneys' fees—not just those associated with the trade secrets and patent claims.

Although Plaintiffs have asserted multiple claims in this case, the Court has discretion to award attorneys' fees for work on all of the claims because the patent claims and other claims are so commingled that it is "impossible to separately treat the evidence which was relevant and material to the patent count and its defenses from the evidence relevant and material to the other counts."  *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 267 F. Supp. 726, 788 (S.D. Cal. 1966); *see Talon, Inc. v. Union Slide Fastener, Inc.* 266 F. 2d 731, 739-41 (9th Cir. 1959) (stating that fees are recoverable for work *related* to the patent claim and not just *based* on the patent claim); *See also, e.g.,* Order Requesting Further Briefing on Joint Mot. to Resolve Discovery Dispute Re: Unjust Enrichment Theory of Damages, Doc. No. 269, 2:10-13

(noting that surviving and terminated claims had "same factual predicate").

### 2.      Defendants attorneys' fees are reasonable.

Under both CUTSA and 35 USC § 285, Defendants are entitled to recover their "reasonable" attorneys fees.   To determine a "reasonable" attorney fee award, district courts calculate the "lodestar" amount: the product of multiplying the number of hours reasonably expended on the litigation by a reasonable hourly fee.  *See Hensley v. Eckerhart,* 461 US 424, 433–437 (1983); *City of Burlington v. Dague*, 505 US 557, 561, (1992); *Perdue v. Kenny A. ex rel. Winn*, 130 S.Ct. 1662, 1672–73 (2010) (noting method "has achieved dominance in the federal courts" and "has become the guiding light of our fee-shifting jurisprudence"  (quotation and citations omitted)).

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.

*Hensley*, 461 US at 433.

### a.      Counsel expended a reasonable number of hours.

In total, Qualcomm incurred legal bills for 22,921.5 hours from lead trial counsel Cooley LLP expended in the four years from September of 2008 through September of 2012.  (Karr Decl., ¶11 and Ex. E.)  Qualcomm also employed licensed contract attorneys through Black Letter Discovery, who performed 6949.5 hours of document review.  (*See id.* at ¶ 9 and Ex. G.)  For a litigation of this magnitude and duration, these hours were both reasonable and necessary.

In this case, Plaintiffs claimed that Qualcomm had incorporated Plaintiffs' ideas into "at least ninety-two" U.S. and Foreign patents and claimed damages in excess of $1 billion.  (Fourth Amended Compl., Doc. No. 53, ¶ 159A.)  Counsel is unaware of any other litigation involving this number of patents.  Moreover, the allegations covered more than a decade of activity.  (*Id*. at ¶ 62, 15.).

Not surprisingly, the amount of discovery and preparation necessary to defend this case was immense.  Defendants interviewed dozens of witnesses, collected more than *12 million* paper and ESI records, and engaged in thousands of hours of document review to satisfy their discovery

COOLEY LLP
ATTORNEYS AT LAW

19.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

1  obligations.[7]  (Karr Decl., ¶ 11).  In addition, Defendants had to review over 300,000 documents
2  produced by Plaintiffs.  Defendants had to prepare for and take or defend almost 40 depositions
3  across the United States.  (Karr Decl., ¶ 11).  Simply put, the number of hours incurred was
4  reasonable and necessary.

### b. Counsels' billing rates are reasonable.

6  In deciding the lodestar amount, the Court must compare Cooley's rates with the
7  "prevailing market rate of the relevant community" for comparable attorneys.  *Carson v. Billing*
8  *Police Dept.*, 470 F.3d 889, 891 (2006) (quoting *Guam Soc'y of Obstetricians & Gynecologists v.*
9  *Ada*, 100 F.3d 691, 696 (9th Cir. 1996)).  As show in the biographies submitted herewith, Cooley
10  staffed this case with experienced attorneys with expertise in large, complex intellectual property
11  cases.  Cooley's rates for its attorneys are lower than those charged by comparable firms
12  throughout California.  (Karr Decl. ¶¶ 4, 5 and Exs. B, C).  Indeed, it appears that the rates
13  charged by Cooley attorneys in this case are lower than the rates typically charged by Hughes,
14  Hubbard & Reed.  (*Compare* Karr Decl. Ex. E *with* Ex. D, at pp. 39 – 42).[8]  Black Letter
15  Discovery typically charged $55 per hour for review by an attorney licensed in California, and
16  $67 per hour for review by the project manager (Shay Logan).[9]  (*Id.* at Ex. G.)  These rates are
17  typical for reviews of this type performed by contract attorneys admitted to the California bar.

### c. The resultant lodestar is objectively reasonable.

19  Because both the hours and billing rates were reasonable, the resulting lodestar is also
20  reasonable.  That result is $10,244,053.00.[10]  Even beyond the lodestar calculation, Defendants'

---

[7]  Records reflect 106 requests for initial and follow-up witness and document custodian interviews.  (Karr Decl., ¶ 11.)  In its Bond Order, the Court acknowledged the large number of witnesses identified by the parties in early disclosures and discovery.  (18:25-27.)  The Court also acknowledged both the large amount in controversy, the extraordinary number of patents implicated by the operative complaint, and the likely expense of this lawsuit.  (*Id.* at 16:13-16.)
[8]  The rates listed pages 39 – 42 of Ex. D "reflect a 10% public interest discount from HHR's standard rates."  (*Id.* at ¶18.)  Moreover, they are "blended composite" rates from October 2011 through February 2012.  (*Id.* at n.1, p.39 of 45.)  Because firms generally adjust their rates at the start of the new calendar year, this "blended composite" probably reflects an average of rates from 2011 & 2012.  The relevant rate is the rate in effect at the time of the fee application.  *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).
[9]  Overtime rates were higher.
[10]  Of that total, $10,244,053.00 is attributable to Cooley.  (*See* Karr Decl., ¶ 7, Ex. E).  The remaining $391,928.91 is Black Letter Discovery's bill for 6949.5 hours of contract document review.

1  attorneys' fees are both reasonable and logical in the context of this litigation. As Plaintiffs
2  sought "an amount exceeding $1 billion," it's hard to see how **roughly one percent** of the
3  recovery sought would be unreasonable. Indeed, Plaintiffs cannot contend that it is. In early
4  2010, one of Plaintiffs' own directors noted how expensive this case would be, stating that "[t]he
5  case will cost $10m all in, with half [of] that to be spent the first year." (*See* Teter SJ Decl., Ex. 9
6  at 2.)

7            **d.**        **Defendants also seek recovery of fees for computer-assisted algorithm-driven document review.**

8      In addition to the fees claimed above, Defendants also seek to recover $2,829,349.10 in
9  fees for document review performed by complex computer algorithm generated by San
10  Francisco-based H5. Over the course of this litigation, Defendants collected almost 12,000,000
11  records—most in the form of Electronically Stored Information (ESI). (Karr Decl., ¶ 11.) Rather
12  than review this entire volume, the parties negotiated and agreed to a set of search terms early in
13  this litigation to cull irrelevant documents from the review population. Defendants applied those
14  terms across all the ESI Defendants collected for this case. Rather than manually reviewing the
15  huge volume of resultant records, Defendants paid H5 to employ its proprietary technology to sort
16  these records into responsive and non-responsive documents.[11]  (*Id.* ¶10.) The H5 algorithm
17  made initial responsiveness determinations for more than *one million documents*. Had Qualcomm
18  employed attorneys to review that volume of documents, the result would have been far more
19  time-consuming and no less expensive. Because Defendants would seek compensation for that
20  traditional, attorney-driven responsiveness review, it is reasonable for the Court to award the fees
21  charged to Defendants by H5 for developing and employing a first-level document review
22  algorithm.

23  **IV.  CONCLUSION.**

24      This was not a case of two reasonable parties bringing a *bona fide* dispute to the Court.
25  Defendants knew that all along, and the Court candidly said as much more than two years ago in

---

27  [11] This process was not redundant of the human review performed by Black Letter Discovery
28  discussed *supra*. Black Letter Discovery's attorneys reviewed those documents *already deemed responsive* by the H5 algorithm and checked them for confidentiality, privilege, and relevance.

COOLEY LLP
ATTORNEYS AT LAW

21.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD

the Bond Order. The law allows this Court to sanction parties and their counsel for their bad faith pursuit of a meritless case and for litigation misconduct. It's hard to think of a more appropriate set of circumstances to levy such a sanction. The Court should find Plaintiffs and their lawyers jointly and severally liable for $13,465,331.01—the reasonable attorney fees accrued by Defendants in systematically dismantling this meritless lawsuit.

Dated: October 12, 2012

RESPECTFULLY SUBMITTED,

COOLEY LLP


/s/ Jeffrey S. Karr
STEVEN M. STRAUSS (sms@cooley.com)
JOHN S. KYLE (jkyle@cooley.com)
TIMOTHY S. TETER (teterts@cooley.com)
JEFFREY S. KARR (jkarr@cooley.com)
Attorneys for Defendants

1067225 v1/HN

COOLEY LLP
ATTORNEYS AT LAW

22.

DEFENDANTS' MOTION FOR
ATTORNEYS' FEES
CASE NO. 08-CV-1992 AJB MDD